FOR PUBLICATION

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| WHERE DO WE GO BERKELEY; KEVIN CODDINGTON; JOSE MORFIN; JONATHAN JAMES; KINNDRA MARTIN; MARIAH JACKSON; SHAWNA GARCIA; ALHONDRO MYERS; RONNIE BROOKS; TERRY LEE WALKER; JASON MILLER; SARAH TEAGUE, Plaintiffs-Appellees, v. CALIFORNIA DEPARTMENT OF TRANSPORTATION; TOKS OMISHAKIN, individually and in his official capacity as Director of Caltrans; DINA EL-TAWANSY, individually and in her official capacity as Director of District Four, Defendants-Appellants. | No. 21-16790 D.C. No. 3:21-cv-04435-EMC OPINION |

Appeal from the United States District Court
for the Northern District of California
Edward M. Chen, District Judge, Presiding

Argued and Submitted April 15, 2022
San Francisco, California

Before: Jay S. Bybee and Ryan D. Nelson, Circuit Judges, and Susan R. Bolton,[*]

---

[*] The Honorable Susan R. Bolton, United States District Judge for the District of Arizona, sitting by designation.

District Judge.

Opinion by Judge R. Nelson

R. NELSON, Circuit Judge:

We are asked to decide what the Americans with Disabilities Act ("ADA") likely requires when the California Department of Transportation ("Caltrans") coordinates and liaises with other government services before clearing homeless encampments. When Caltrans planned to clear high-risk encampments along the freeway, Plaintiff campers sought an injunction. The district court required Caltrans to give Plaintiffs six months to relocate and find housing before clearing the encampments. We vacate the district court's order because there is no serious question that the ADA requires such a lengthy delay. We also hold that the district court abused its discretion when evaluating the injunction's harm to Caltrans and public safety, and thus erred in balancing the equities.

I

A

California law provides Caltrans with "full possession and control" of state highways and property acquired for state highway purposes. Cal. Sts. & High. Code § 90. On one of these properties, situated along an exit ramp for Interstate 80, lies a cluster of homeless encampments. Over the last several years, Caltrans has worked to clear these encampments while coordinating with local partners to facilitate the

2

relocation of people who live there. This case is about Caltrans's efforts to clear two high-risk encampments and the district court's injunction preventing it from doing so.

Caltrans, under its authority to "do any act necessary, convenient or proper for the . . . maintenance or use of all highways," *id.* § 92, clears its properties of homeless encampments according to its assessment of the risks posed by each encampment. When the COVID-19 pandemic presented new health concerns for homeless populations, Caltrans published interim guidance to govern its triage and clearance process. The Interim Guidance instructs Caltrans to "attempt to request assistance from local partners on homelessness but . . . not allow the response by outreach teams to interfere with addressing critical safety concerns."

Each encampment is assigned a priority level based on its threat to public safety. The priority level determines whether and when the encampment will be cleared. Level 1 camps pose a "critical safety concern" and "[r]equire[] urgent relocation in coordination with the [California Highway Patrol], and with local partners on homelessness if possible." Examples of level 1 encampments include sites "within the clear recovery zone, which is the area where a car may swerve off of the road and still recover back to the roadway," sites that "[c]onnect[] to a power source or other State utility," and sites that "physically block[] traffic, bike or pedestrian pathways and [are] an imminent danger to the unsheltered or the public."

3

As a general rule, Caltrans provides 72 hours' notice to vacate level 1 encampments. Notice is not required for "encampments that pose an immediate health or safety hazard."

Level 2 camps are "[h]igh [p]riority" and also pose "a safety concern," though to a lesser degree. For those sites, Caltrans balances outreach and public safety needs by "work[ing] with local governments/homeless services partners to perform outreach, allowing partners approximately two weeks." Caltrans then provides 72 hours' notice to vacate.

The encampments at issue are designated level 1. Caltrans began its efforts to clear them in July 2020. Together with the City of Emeryville and a homeless outreach organization, Caltrans imposed a ramp-up period of at least six weeks to contact people living in the encampments and, along with Plaintiff Where Do We Go Berkeley ("WDWG"), communicate the need to relocate.

Efforts to clear the encampments were reinvigorated in February 2021, when Caltrans was advised that construction of a housing project was scheduled to begin in March and a portion of Caltrans property had been leased to the construction site owner. According to Caltrans, the construction project was delayed until May to allow time to relocate the campers. In April 2021, Caltrans communicated with its partners about "the general background information of the campers, the removal

4

status and the relocation efforts" and advised that it would post removal notices on June 8, 2021.

## B

One day after Caltrans posted the notices, Plaintiffs sued, arguing that clearing the encampments violated the ADA.[1] They asked the district court for a temporary restraining order ("TRO") to stop Caltrans from clearing the encampments until all residents were given housing. The district court granted a ten-day TRO, which it then extended for another month and a half. *See Where Do We Go Berkeley v. Cal. Dep't of Transp.*, No. 21-CV-04435-EMC, 2021 WL 4427429, at *1 & n.1 (N.D. Cal. Sept. 27, 2021).

WDWG then amended the complaint, seeking the same relief but removing the individual plaintiffs (who had found new places to live) from the suit. The district court declined to grant a preliminary injunction, holding that WDWG could not establish organizational standing. It continued its TRO to allow WDWG to add eleven new individual plaintiffs.

The new individual plaintiffs were offered a place to stay at a warehouse-type group shelter called Horizon. But Plaintiffs argued that the shelter was inaccessible

---

[1] Plaintiffs also raised claims under the Fourth Amendment and federal and state Due Process Clauses. Because the district court granted its injunction based on only the ADA claim, the other claims are not at issue.

5

to them because of their disabilities and again requested an injunction to prevent Caltrans from clearing the encampments.

The district court granted in part Plaintiffs' request for a preliminary injunction. *Id.* at \*6. Its order permitted Caltrans to clear the leased portion of its property but enjoined Caltrans from clearing the rest of the property for six months. *Id.* In doing so, the district court held that Plaintiffs had raised serious questions on the merits of their ADA claim. *Id.* at \*5. The district court also held that Plaintiffs had shown a likelihood of irreparable harm, noting that most of the individual plaintiffs had mental disabilities which made the Horizon shelter inaccessible and that clearing the encampments would leave them with nowhere to go. *Id.* at \*2–3, \*5. Thus, it found that the harm to Plaintiffs outweighed Caltrans's temporary harm in being unable to clear the encampments. *Id.* at \*4–5. The district court also recognized that the encampments created a serious threat to public safety. *Id.* at \*4. But it concluded that Caltrans could mitigate this harm by reopening Seabreeze, a previously cleared property, for the campers' use. *Id.*

The district court's preliminary injunction emphasized that the grounds for the injunction would wane over time. *Id.* at \*6. In particular, it noted that Caltrans would meet its obligation to accommodate Plaintiffs as time was provided. *Id.* The injunction was set to expire on March 23, 2022. *Id.*

Caltrans appealed the district court's injunction. Because the injunction was set to expire before argument, we requested supplemental briefing on mootness. Caltrans argued that the issue would not become moot because Plaintiffs had moved for a four-month extension of the injunction and therefore the dispute fell within the exception for issues capable of repetition, yet evading review. Plaintiffs argued that the appeal would be moot because any new injunction would have different terms including "a smaller set of Plaintiffs and, potentially, a different location." The district court extended the original injunction until April 30, 2022.

## II

"A preliminary injunction should only be set aside if the district court abused its discretion or based its decision on an erroneous legal standard or on clearly erroneous findings of fact." *FTC v. Consumer Def., LLC*, 926 F.3d 1208, 1211–12 (9th Cir. 2019) (quoting *Puente Ariz. v. Arpaio*, 821 F.3d 1098, 1103 (9th Cir. 2016)). "We review the district court's legal conclusions *de novo*, the factual findings underlying its decision for clear error, and the injunction's scope for abuse of discretion." *Id.* at 1212 (quoting *K.W. ex rel. D.W. v. Armstrong*, 789 F.3d 962, 969 (9th Cir. 2015)). A factual finding constitutes clear error if it is "illogical, implausible, or without support in inferences that may be drawn from the facts in the record." *M.R. v. Dreyfus*, 697 F.3d 706, 725 (9th Cir. 2012) (quoting *United States v. Hinkson*, 585 F.3d 1247, 1263 (9th Cir. 2009) (en banc)).

7

## III

We first determine whether we have jurisdiction to review the expired original injunction. When an appealed injunction expires by its own terms, the appeal generally becomes moot. *See, e.g.*, *Shell Offshore Inc. v. Greenpeace, Inc.*, 815 F.3d 623, 628 (9th Cir. 2016). This rule is subject to an exception for disputes "capable of repetition, yet evading review." *See Shell Offshore, Inc. v. Greenpeace, Inc.* ("*Greenpeace II*"), 709 F.3d 1281, 1287 (9th Cir. 2013) (quoting *NAACP, W. Region v. City of Richmond*, 743 F.2d 1346, 1353 (9th Cir. 1984)). "In order for the exception to apply, (1) the duration of the challenged action or injury must be too short to be fully litigated; and (2) there must be a reasonable likelihood that the same party will be subject to the action again." *Id*. (quotation marks omitted) (quoting *NAACP, W. Region*, 743 F.2d at 1353).

Although the appealed order expired before argument, we hold that the dispute is not moot because it is capable of repetition, yet evading review. *See id*. The six-month preliminary injunction is too brief for an appeal to be fully litigated, and there is a reasonable likelihood that Caltrans will be subject to similar injunctions in the future.

"An action is 'fully litigated' if it is reviewed by this Court and the Supreme Court." *Id*. We have already held that "a transaction set for a term of 17 months . . . would be likely to expire before our review (let alone the Supreme Court's) could

8

be completed," and is thus "likely to evade review." *Alcoa, Inc. v. Bonneville Power Admin.*, 698 F.3d 774, 787 (9th Cir. 2012) (quotation marks omitted). These constraints apply "even where (as here) the parties d[id] not seek expedited review or a stay pending appeal." *Id*.

In 2012, we relied on statistics showing that in 2010 and 2011 "the average time in this court from the filing of a notice of appeal through to final disposition of a case was 16.4 and 17.4 months, respectively." *Id*. at 787 n.9 (citing *Ninth Circuit: 2011 Annual Report* 59, *available at* https://cdn.ca9.uscourts.gov/datastore/judicial-council/publications/AnnualReport2011.pdf). Since then, those averages have dropped—in the most recent two years with available data, 2019 and 2020, the average times were 10.8 months and 12.5 months. *Ninth Circuit: 2020 Annual Report* 62, *available at* https://cdn.ca9.uscourts.gov/datastore/judicial-council/publications/AnnualReport2020.pdf. But even with these improvements, it is unlikely that a six-month injunction will be fully litigated. The injunction's duration is simply too short for an appeal to run its course.

As for the second prong, there is more than a reasonable likelihood that the dispute will recur. Indeed, it has already happened. In this very case, Plaintiffs requested (and partially received) an extension of the original injunction.[2] And the

---

[2] We sua sponte take judicial notice of the district court's order extending the injunction. *See United States ex rel. Robinson Rancheria Citizens Council v.*

initial TRO was extended for six weeks before the injunction issued. Although the district court's latest order states that its injunction "will terminate on April 30, 2022," nothing prevents Plaintiffs from seeking a new injunction with the same practical effect.

Other reasons suggest that this dispute is likely to recur. WDWG works with homeless individuals along the I-80 corridor in the East Bay. It is reasonably likely that new people could move to the encampments at issue and join the suit. As has already happened in this case, new campers could request another injunction. Or they could file suits of their own. In fact, a recent case in the Northern District of California involves similar theories and requests for relief. *See Blumberg v. Chambers*, No. 3:22-cv-01834-MMC (N.D. Cal. 2022) (filed Mar. 23, 2022). Finally, WDWG could challenge clearings of other nearby encampments. Any of these scenarios would satisfy the second prong of the "capable of repetition, yet evading review" test. *See A.D. ex rel. L.D. v. Haw. Dep't of Educ.*, 727 F.3d 911, 914 (9th Cir. 2013).

Plaintiffs argue that the dispute is unlikely to recur under our analysis in *Ahlman v. Barnes* because "a reasonable expectation requires more than a mere

---

*Borneo, Inc.*, 971 F.2d 244, 248 (9th Cir. 1992) (citation omitted) (noting that we "may take notice of proceedings in other courts . . . if those proceedings have a direct relation to matters at issue" (quoting *St. Louis Baptist Temple, Inc. v. FDIC*, 605 F.2d 1169, 1172 (10th Cir. 1979))).

10

possibility that something *might* happen," and there is no more than a "mere possibility" here. *See* 20 F.4th 489, 494 (9th Cir. 2021) (citation and quotation marks omitted). But in *Ahlman*, the likelihood of a new injunction being granted was "remote." *Id*. at 495. The Supreme Court had already stayed the injunction. *Barnes v. Ahlman*, 140 S. Ct. 2620 (2020); *Ahlman*, 20 F.4th at 492–93. Here, on the other hand, the injunction was never vacated or stayed and Plaintiffs have already asked for and received an extension of the original injunction, which remains in place.

Second, Plaintiffs argue that any new injunction would be based on different facts and thus not the "same action." *See United States v. Sanchez-Gomez*, 138 S. Ct. 1532, 1540 (2018) (quoting *Turner v. Rogers*, 564 U.S. 431, 439–40 (2011)). But when looking at reasonable likelihood of recurrence, we have never insisted that the facts be identical. In *Greenpeace II*, for example, it was enough that the same party seemed likely to challenge the same action again. 709 F.3d at 1288. We did not delve further into the facts to ensure that the conditions of the challenge would be exactly the same. And in *A.D.*, we found the exception satisfied even when future challenges would come from different plaintiffs who would sue on similar grounds. 727 F.3d at 914. Based on these cases, another preliminary injunction—either in this case or in a similar case—would be similar enough to count as a recurrence.

Finally, Plaintiffs argue that even if the case is not moot, we should stay the appeal to allow the parties to brief the extension order instead. But delaying this

11

appeal to adjudicate a new order would essentially facilitate the dispute's ability to recur and evade review. With a new round of briefing, the appeal would stretch beyond the expiration of the extended injunction.

IV

Having confirmed that the dispute is not moot, we turn to the substance of Caltrans's appeal.

The Supreme Court has explained that plaintiffs seeking a preliminary injunction must establish that (1) they are likely to succeed on the merits, (2) they are likely to suffer irreparable harm absent preliminary relief, (3) the balance of equities tips in their favor, and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). We employ a "sliding scale test," which allows a strong showing on the balance of hardships to compensate for a lesser showing of likelihood of success. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134–35 (9th Cir. 2011). Thus, when plaintiffs establish that the balance of hardships tips sharply in their favor, there is a likelihood of irreparable injury, and the injunction is in the public interest, they need only show "serious questions" on the merits. *Id.* at 1135.[3]

---

[3] Plaintiffs probably had to show a likelihood of success on the merits given the district court's abuse of discretion in balancing the equities. *See infra* Part IV.C. Because Plaintiffs fail to show even a serious question on the merits, we do not reach that issue.

We hold that the district court erred in finding serious questions going to the merits of Plaintiffs' ADA claim and in balancing the equities.

A

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Its implementing regulations require state agencies to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7)(i).[4] To state a prima facie case for a violation of Title II, Plaintiffs must show that (1) they are "qualified individual[s] with disabilit[ies]"; (2) they were "either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or w[ere] otherwise discriminated against by the public entity"; and (3) "such exclusion, denial of benefits, or discrimination was by reason of [their] disabilit[ies]." *Payan*, 11 F.4th

---

[4] Title II uses the term "reasonable modification" rather than the "reasonable accommodation" term found in Title I, the part of the ADA that applies to employers. The terms "create identical standards and may be used interchangeably." *Payan v. L.A. Cmty. Coll. Dist.*, 11 F.4th 729, 738 n.4 (9th Cir. 2021) (citation omitted).

at 737 (quoting *Duvall v. County of Kitsap*, 260 F.3d 1124, 1135 (9th Cir. 2001), *as amended on denial of reh'g* (Oct. 11, 2001)). The parties do not dispute that Plaintiffs satisfy the first and third elements of a Title II claim. Their disagreement is limited to whether Plaintiffs have established a serious question that they were denied the benefits of Caltrans's programs or otherwise discriminated against.

The district court held that Plaintiffs had established serious questions on the merits of their claim. It provided two bases for its holding. First, it concluded that Plaintiffs sufficiently asserted that "Caltrans ha[d] implemented a 'program' regarding the removal of homeless encampments (*e.g.*, as reflected in the Interim Guidance)" and the ADA required the program to give "reasonable accommodation to disabled persons because they . . . need more time before being evicted." *Where Do We Go Berkeley*, 2021 WL 4427429, at *5. In the alternative, the district court held that Plaintiffs had stated a "plausible claim" that clearing the encampments would violate the second clause of Title II of the ADA, which prohibits a public entity from discriminating against disabled persons. *See id.*; 42 U.S.C. § 12132.

The district court's analysis concluded by recognizing that the ADA does not require modifications that would "fundamentally alter" the nature of Caltrans's programs. *Where Do We Go Berkeley*, 2021 WL 4427429, at *6. But it held that there was a serious question about whether a six-month injunction would reach the level of a "fundamental alteration of Caltrans's property and function." *Id.* It

14

conceded that the longer the accommodation, the stronger Caltrans's argument that its property was being "fundamentally altered to that of providing housing." *Id.*

In reviewing the district court's six-month injunction, we must first define the Caltrans "programs" subject to the ADA. We then examine whether the district court's remedy is a "reasonable modification" of those programs or a more major change that "fundamentally alters" their nature.

1

The district court never explicitly described the scope of Caltrans's "program" that serves as the basis for Plaintiffs' ADA claim. It seemingly accepted Plaintiffs' definition: a "program regarding the removal of homeless encampments (*e.g.*, as reflected in the Interim Guidance)." *See id.* at *5. On its face, this tells us little about what Caltrans's programs do and do not entail—and therefore what could be a "reasonable modification" of that program.

Caltrans argues that clearing the encampments involves no ADA obligation because its properties are not open to the public. But arguing that the properties are not open to the public is a distinction without meaning: the ADA's prohibition on discrimination in public programs "bring[s] within its scope anything a public entity does." *Barden v. City of Sacramento*, 292 F.3d 1073, 1076 (9th Cir. 2002) (quotation marks omitted) (quoting *Lee v. City of Los Angeles*, 250 F.3d 668, 691 (9th Cir. 2001)). It applies to a wide range of public functions, such as access to public

15

sidewalks, medical licensing, and zoning. *See LA All. for Hum. Rts. v. County of Los Angeles*, 14 F.4th 947, 959 (9th Cir. 2021); *Hason v. Med. Bd. of Cal.*, 279 F.3d 1167, 1173 (9th Cir. 2002); *Bay Area Addiction Rsch. & Treatment, Inc. v. City of Antioch*, 179 F.3d 725, 732 (9th Cir. 1999). We have also applied it to the way entities enforce the law. For example, we have allowed claims for enforcing a local nuisance code, *McGary v. City of Portland*, 386 F.3d 1259, 1268–70 (9th Cir. 2004), and enforcement of a health and safety quarantine, *Crowder v. Kitagawa*, 81 F.3d 1480, 1485 (9th Cir. 1996). "The focus of the inquiry . . . is not so much on whether a particular public function can technically be characterized as a service, program, or activity, but whether it is a normal function of a governmental entity." *Barden*, 292 F.3d at 1076 (quotation marks omitted) (quoting *Bay Area Addiction*, 179 F.3d at 731).

While there is a program, it is not enough to say that Caltrans interacts with homeless people on its properties. We must also define the scope of the program to determine whether a six-month injunction is a reasonable modification that is required by the ADA or a fundamental alteration that is not.

In *Zimmerman v. Oregon Department of Justice*, 170 F.3d 1169, 1174 (9th Cir. 1999), we considered the scope of "services, programs, and activities" offered by a parks department. We reasoned that the term included things like operating a swimming pool, leading nature walks, and maintaining playgrounds, but not things

16

like buying lawnmowers and hiring people to operate them, which were just "means to deliver the services, programs, and activities" and not services, programs, or activities themselves. *Id*.

Fairly analyzed, Caltrans's programs are far more limited than Plaintiffs contend or the district court held. The Interim Guidance states that Caltrans collaborates with local partners to help people at the encampments connect with critical services and housing solutions. But Caltrans itself does not provide those services; it "is not the appropriate entity to provide social services or relocation assistance."

Caltrans's programs also include clearing the encampments. Exactly how Caltrans clears an encampment depends on the encampment's priority level. Caltrans "immediately resolve[s]" level 1 encampments, which "pose imminent threats to safety or infrastructure." Coordination with local partners is encouraged "if possible." Caltrans provides 72 hours' notice to vacate, "with the exception to encampments that pose an immediate health or safety hazard." In short, time is of the essence when it comes to level 1 encampments; addressing urgent safety risks is the primary goal.

Caltrans's programs for level 1 encampments are abbreviated and expedited when compared to Caltrans's engagement with lower-priority encampments. For example, the Interim Guidance for level 2 encampments allows local partners about

two weeks to conduct outreach (with a shorter timeline for construction projects requiring a ten-day period for relocation and cleanup). Levels 3 and 4 do not even require relocation; instead, the Interim Guidance instructs Caltrans to work with local partners responsible for implementing "relocation solutions" and to keep the sites clear of trash and hazardous waste.

In sum, Caltrans's "programs" for level 1 encampments provide, when possible, 72 hours' notice before clearing and possible coordination with local partners. More importantly, some services are not part of any program: Caltrans does not provide campers with alternative housing, nor does it allow two weeks for coordination with local partners (as for level 2 encampments) because the risks posed by the encampment are too urgent to allow campers to stay.

2

Having defined Caltrans's programs for level 1 encampments, we next ask whether a six-month delay in clearing the encampments is a "fundamental alteration" of those programs.

The ADA requires "only 'reasonable modifications' that would not fundamentally alter the nature of the service provided." *Tennessee v. Lane*, 541 U.S. 509, 532 (2004) (citation omitted). "[I]n no event is the entity required to undertake measures that would impose an undue financial or administrative burden . . . or effect a fundamental alteration in the nature of the service." *Id.* "[P]ublic entities

18

are not required to create new programs that provide heretofore unprovided services to assist disabled persons." *Townsend v. Quasim*, 328 F.3d 511, 518 (9th Cir. 2003) (citations omitted).

The distinction between a reasonable modification and fundamental alteration is "fact-specific, requiring case-by-case inquiry." *Crowder*, 81 F.3d at 1486. A modification's reasonableness depends on how it impacts the goals of an agency's program. For programs designed to address risks to the public, reasonableness depends on the nature of the risk, whether the proposed modification would affect the agency's ability to address the risk, and the probability of worsening the risk if the agency is forced to alter its programs. *See id.* We also "take into account financial and other logistical limitations on [the program]." *Townsend*, 328 F.3d at 519.

Here, a six-month delay is a fundamental alteration of Caltrans's programs, which provide for expedient clearing of level 1 encampments and include, when possible, 72 hours' notice and coordination with local partners. Precluding Caltrans from addressing a level 1 encampment's urgent threat to public safety and infrastructure—and suggesting that the risk is mitigated because Caltrans might reopen Seabreeze for campers' use—essentially requires Caltrans "to create new programs that provide heretofore unprovided services." *See id.* at 518. The district court effectively asked Caltrans to house Plaintiffs on its property until Plaintiffs

19

found new housing, with no regard to the safety risks that make clearing level 1 encampments so critical. But Caltrans does not provide people with housing solutions and cannot make clearing level 1 encampments dependent on when the people living there can relocate.

B

Even if the scope of Caltrans's programs precludes relief, the district court also held that Plaintiffs had established a plausible claim that they were entitled to relief under the second clause of Title II, which provides that a public entity cannot subject a disabled person to discrimination. *Where Do We Go Berkeley*, 2021 WL 4427429, at \*5. It noted our decision in *Zimmerman*, which held that Title II prohibits discrimination in an entity's "outputs" (*i.e.*, the programs it extends to the public) but not its "inputs" (*e.g.*, employment). 170 F.3d at 1174–76. The district court acknowledged that we have "not defined with precision the outer limits of the clause" and concluded that the "subjected to discrimination" clause could apply even if Caltrans provided no "service, program, or activity" under the ADA. *Where Do We Go Berkeley*, 2021 WL 4427429, at \*5.

First, the district court wrongly used the lack of a precise outer limit for the discrimination clause to hold that Plaintiffs had shown serious questions on the merits. Instead, before exercising its authority to issue an injunction, the district court must analyze the merits. The Supreme Court has explained that plaintiffs

seeking a preliminary injunction must establish that they are likely to succeed on the merits. *Winter*, 555 U.S. at 20. Our sliding scale test permits plaintiffs to satisfy this requirement with a "serious question" on the merits when the balance of hardships tips sharply in their favor. *All. for the Wild Rockies*, 632 F.3d at 1134–35. But none of these legal standards allows the district court to enter an injunction on a merely plausible claim. Nor can the district court forgo legal analysis just because it has not identified precedent that places the question beyond debate.

In any event, the district court's alternative holding contradicts our precedent. Title II's second clause precludes intentional discrimination *in an entity's programs*. *Zimmerman*, 170 F.3d at 1176. This is because the second clause still requires a plaintiff to establish that he or she is a "qualified individual with a disability," and a plaintiff is not "qualified" to bring a Title II claim unless he or she "meets the essential eligibility requirements" for a public service, program, or activity. *See id.* at 1175–77; 42 U.S.C. § 12132. We have thus held that Title II's clauses differ only in their method of prohibiting discrimination: "Congress intended for the second clause to prohibit *intentional* discrimination, whereas it intended for the first clause to prohibit *disparate treatment* of the disabled." *Zimmerman*, 170 F.3d at 1176. The district court erred by supporting its injunction on what it deemed a "plausible claim" that Caltrans must delay clearing the encampments even if it provided no program

21

under the ADA. No injunction can issue based on only a plausible claim—and Plaintiffs' claims were not plausible.[5]

C

We also hold that the district court erred by incorrectly mitigating the hardships caused by the injunction. When evaluating the balance of equities, the district court noted that Plaintiffs' potential injury was "exacerbated by the public health concerns of disbanding homeless encampments during the COVID-19 pandemic." *Where Do We Go Berkeley*, 2021 WL 4427429, at *3. It then described the hardships to Caltrans and the public if an injunction were granted. It recognized that the encampments were "in need of urgent relocation" and that allowing them "to remain in place permanently [was] clearly not viable." *Id.* at *4. The district court recognized that these encampments posed serious public safety risks, including risks to drivers and the campers themselves, as well as electrical, fire, and environmental hazards. *Id.* For example, some campers had broken into Caltrans electrical boxes to get power, "which can trip breakers, overload circuits, and/or otherwise cause electrical faults, which can in turn impact Smart Corridor display signs." *Id.* The district court also noted that "no serious injuries or harms have

---

[5] Because there is no serious question that the ADA requires a six-month delay in Caltrans's efforts to clear the encampments, we decline to reach Caltrans's arguments about irreparable harm, state law, and the scope of the injunction.

occurred."[6] *Id.* Despite the serious risks to the public, the district court decided that the balance of hardships tipped sharply in Plaintiffs' favor because Caltrans could allow people to move to Seabreeze, a different Caltrans property that had been previously cleared.[7] *Id.*

The district court correctly recognized the public safety risks associated with allowing the campers to stay. But it erred by finding that these risks were mitigated by the injunction's "limited duration" and the fact that Caltrans is "in a position to mitigate the risk associated with the encampments at issue by allowing campers to stay, on a temporary basis, . . . at Seabreeze." *Id.* The length of the injunction was invalid, and consideration of reopening Seabreeze as a mitigating factor was also improper.

Caltrans strongly objected to allowing the encampments to be moved to Seabreeze, and rightfully so. The district court cannot require Caltrans to allow the campers to live on another Caltrans property because such an order goes beyond preserving the status quo. *Cf. Fraihat v. ICE*, 16 F.4th 613, 645 (9th Cir. 2021).

---

[6] A dog belonging to two Plaintiffs, however, was struck and killed by a passing vehicle directly in front of one of the encampments.

[7] The district court excepted one portion of the encampments from this conclusion: it permitted Caltrans to clear the right of way leased for the construction project to build new housing.

This would be no different from the district court requiring Caltrans to move the campers into a hotel or other housing.

The district court cites no authority for why it could require Caltrans to do so. Nor does it include this requirement as part of the injunction. Instead, it shoehorns this solution into the injunction by stating that "if Caltrans were to allow the individual plaintiffs to move to Seabreeze, the Court would lift the preliminary injunction." *See Where Do We Go Berkeley*, 2021 WL 4427429, at *4. The district court improperly considered this as a mitigating factor, and thus the district court erred in minimizing the serious hardships posed by the injunction.

The district court's erroneous analysis comes with another consequence. The district court acknowledged that "the balance of hardship shifts in Caltrans's favor over time." *Id.* at *6. But its balancing assumed that the harms to Caltrans and the public could be reduced to nothing if Caltrans reopened Seabreeze, so we are left in the dark about how and when that shift occurs and, most importantly, at what point the balancing of the equities would no longer tip strongly in Plaintiffs' favor. For all these reasons, the district court abused its discretion in balancing the equities.

V

We vacate the district court's injunction. The district court legally erred in holding that a serious question exists as to whether Caltrans violated the ADA. Requiring Caltrans to delay clearing its properties for six months is not a reasonable

24

modification of Caltrans's programs.  The district court also erred when balancing the equities by inappropriately mitigating the harm to Caltrans and the public and ignoring how the balance of hardship shifts in Caltrans's favor over time.

**VACATED AND REMANDED.**