**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ASSURANCE WIRELESS USA,
L.P.; METROPCS CALIFORNIA,
LLC; SPRINT SPECTRUM LLC; T-
MOBILE USA, INC.; T-MOBILE
WEST LLC,

               *Plaintiffs-Appellants*,

   v.

ALICE B. REYNOLDS, President of
the California Public Utilities
Commission, in her official capacity;
KAREN DOUGLAS, Commissioner
of the California Public Utilities
Commission, in her official capacity;
DARCIE L. HOUCK, Commissioner
of the California Public Utilities
Commission, in her official capacity;
JOHN REYNOLDS, Commissioner of
the California Public Utilities
Commission, in his official capacity;
GENEVIEVE SHIROMA,
Commissioner of the California Public
Utilities Commission, in her official
capacity,

               *Defendants-Appellees*.

No. 23-15490

D.C. No. 3:23-cv-
00483-LB

OPINION

Appeal from the United States District Court
for the Northern District of California
Laurel D. Beeler, Magistrate Judge, Presiding

Argued and Submitted October 17, 2023
San Francisco, California

Filed April 26, 2024

Before:  Eugene E. Siler,[*] Jacqueline H. Nguyen, and Ryan
D. Nelson, Circuit Judges.

Opinion by Judge R. Nelson

## SUMMARY[**]

### Telecommunications Act

The panel affirmed the district court's order declining to preliminarily enjoin a California Public Utilities Commission rule changing the mechanism for charging telecommunications providers to fund California's universal service program.

The Telecommunications Act requires providers of interstate telecommunications services to "contribute, on an equitable and nondiscriminatory basis, to the specific,

---

[*] The Honorable Eugene E. Siler, United States Circuit Judge for the U.S. Court of Appeals for the Sixth Circuit, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

predictable, and sufficient mechanisms established by the Federal Communications Commission to preserve and advance universal service." The FCC has interpreted the "equitable and nondiscriminatory" requirement to require "competitive neutrality." Under 47 U.S.C. § 254(f), the Act places similar requirements on carriers that provide intrastate services, but, subject to consistency with federal law and competitive neutrality, it gives states the discretion to decide the "manner" that will ensure "the preservation and advancement of universal service in that State."

Until recently, universal service in California was funded based on revenue. Faced with declining revenues, CPUC issued a rule imposing surcharges on telecommunications carriers based not on revenue but on the number of active accounts, called access lines. The carriers sought a preliminary injunction of the access line rule as expressly preempted by § 254(f).

The panel held that the district court properly exercised its discretion in denying preliminary injunctive relief because the carriers were unlikely to succeed on the merits of their express preemption claims. The panel held that § 254(f) preempts state regulations that are "inconsistent with" FCC regulations and that are not "equitable and nondiscriminatory." The carriers did not show a likelihood of success on their claim that the access rule was "inconsistent with" the FCC rule because, while the access line rule differed from the FCC's rule funding interstate universal service programs, the carriers did not show that the access line rule burdened those programs. The panel also rejected the carriers's likelihood of success on their claim that the access line rule was preempted because it was inequitable and discriminatory contrary to § 254(f).

**COUNSEL**

Peter Karanjia (argued), DLA Piper LLP (US), Washington, D.C.; Ben C. Fabens-Lassen and Gaspard Rappoport, DLA Piper LLP (US), Los Angeles, California; Kathleen S. Kizer, DLA Piper LLP (US), San Francisco, California; for Plaintiffs-Appellants.

Hien Vo Winter (argued), California Public Utilities Commission, Legal Division, Sacramento, California; Vanessa Baldwin, David W. Fermino, Jonathan C. Koltz, Christine J. Hammond, and Ian Culver, California Public Utilities Commission, Legal Division, San Francisco, California, for Defendants-Appellees.

Eric S. Tresh and Alla Raykin, Eversheds Sutherland (US) LLP, Atlanta, Georgia, for Amici Curiae Multicultural Media, Telecom, and Internet Council, ALLvanza, the California Hawaii State Conference of the National Association for the Advancement of Colored People, and LatinoJustice PRLDEF.

# OPINION

R. NELSON, Circuit Judge:

Federal law requires both the Federal Communications Commission and the states to charge telecommunications providers to fund universal service programs. Facing declining revenues under its prior funding mechanism, California enacted a new rule charging per access line to advance its own universal service program. A group of carriers claim that the new rule is preempted as "inconsistent with" federal law, which charges by revenue. The district court declined to enjoin the California rule. We affirm.

## I

Congress enacted the Communications Act of 1934 to "make available, so far as possible, to all the people of the United States . . . a rapid, efficient, Nation-wide, and world-wide wire and radio communication service with adequate facilities at reasonable charges." 47 U.S.C. § 151. This is known as universal service. In 1996, Congress enacted the Telecommunications Act, which amended the Communications Act. Under the Telecommunications Act, "[e]very telecommunications carrier that provides interstate telecommunications services shall contribute, on an equitable and nondiscriminatory basis, to the specific, predictable, and sufficient mechanisms established by the [FCC] to preserve and advance universal service." *Id.* § 254(d).

The Telecommunications Act places similar requirements on telecommunications carriers that provide intrastate services. But it does not tell the states how to achieve that goal. Instead, it leaves to the states the right "to

adopt regulations not inconsistent with the [FCC]'s rules [that] preserve and advance universal service" on an "equitable and nondiscriminatory basis." *Id.* § 254(f). The FCC has interpreted the "equitable and nondiscriminatory" requirement to require "competitive neutrality." *Matter of Universal Serv. Contribution Methodology: A Nat'l Broadband Plan for Our Future*, 27 FCC Rcd. 5357, 5373, ¶ 10 (2012). Competitive neutrality, in turn, requires universal service rules (1) to "neither unfairly advantage nor disadvantage one provider over another" and (2) to "neither unfairly favor nor disfavor one technology over another." *Id.* at 5361.

Subject to those two narrow limitations—consistency with federal law and competitive neutrality—the Telecommunications Act gives states, not the FCC, the discretion to decide the "manner" which will ensure "the preservation and advancement of universal service in that State." 47 U.S.C. § 254(f). Through this "system of cooperative federalism," Congress recognized states as "key partners to the federal government in regulating the telecommunications industry." *MetroPCS Cal., LLC v. Picker*, 970 F.3d 1106, 1118 (9th Cir. 2020) (quotations omitted). Guided by this recognition, Congress "called upon [the states] to apply their expertise and judgment" to advance intrastate universal service and gave them "freedom to do so." *Id.* at 1118–19 (cleaned up).

To follow § 254, the FCC established a "universal service fund" to subsidize universal service. 47 C.F.R. Part 54. As § 254(f) allows, "California requires its own universal service contributions." *Picker*, 970 F.3d at 1109. Its California Public Utility Commission (CPUC) issues rules to determine how such contributions are to be calculated. *Id.* at 1109–10. Until recently, universal service

in California was funded based on revenue. *Id.* Revenue, in turn, was calculated using rules requiring "all prepaid providers to apply a uniform, flat rate" equation "to determine their intrastate revenues." *Id.* at 1110. Postpaid services "were free to use any of the three FCC-recognized methods to determine their intrastate revenues for purposes of calculating surcharges owed to the CPUC." *Id.* CPUC faced a problem as funding universal service using a revenue system proved unsustainable. As time passed, the base of chargeable surcharges—which largely comprised landlines—declined.[1]

Faced with declining revenues inadequate to support CPUC's universal service programs, CPUC considered other options for funding the federally mandated universal service programs. It landed on a rule that imposed surcharges on telecommunications carriers based not on revenue but on the number of active accounts, called access lines. An access line is:

> [A] wire or wireless connection that provides a real time two way voice telecommunications service or [voice over internet protocol] service to or from any device utilized by an end user, regardless of technology, which is associated with a 10-digit NPA-NXX number or other unique identifier and a service address or Place of Primary Use in California.

*Assurance Wireless USA, L.P. v. Reynolds*, No. 23-CV-00483-LB, 2023 WL 2780365, at \*3 (N.D. Cal. Mar. 31,

---

[1] Between 2012 and 2020, the "intrastate revenue billing base" decreased by fifty-eight percent, from \$15.4 billion to \$6.433 billion.

2023).  Under the new rule, all carriers apply an objective standard to "count and report access lines" to ensure that "all end users (residential, small business, large business) and all service types will pay the same amount." *Id.* (cleaned up). By design, this standard was "more sustainable, technology neutral, unambiguous, and equitable" than the prior system under which the "disproportionate burden" fell on landline users. *Id.* (internal quotations omitted).

Plaintiff carriers sued, unsuccessfully seeking a preliminary injunction of the access line rule as expressly preempted by § 254(f)'s text.  The district court concluded that the "new rule is different from the FCC rule, but the plaintiffs did not establish that it is inconsistent and preempted." *Assurance Wireless USA, L.P.,* 2023 WL 2780365, at *6.  It rejected the carriers's claim that, because the FCC had declined to adopt a connection-based approach to fund the federal universal service program, states needed to do the same. *Id.* at *6–7.  It also spurned the carriers's attempts to "evoke[] conflict preemption" despite "argu[ing] only express preemption." *Id.* at *7.

The district court also concluded that the new rule is both equitable and nondiscriminatory. *Id.* at *7–9.  It explained that "end users, not carriers, pay the surcharges." *Id.* at *9.  And it concluded that it was not unfair because all carriers were subject to the rule. *Id.*  The court also rejected attempts from the carriers to find unfair discrimination in CPUC's decision to subsidize providers of services to low-income wireless users that participate in California's LifeLine Program but not those who provide services to low-income recipients of subsidies under the FCC's Affordable Connectivity Program (ACP). *Id.*  Unlike the ACP, the LifeLine Program "applies to only one member" of a

household.  *Id.*  This difference rendered the two programs "materially distinct."  *Id.*

Although the district court concluded that the carriers's preemption arguments were unlikely to succeed on the merits, it also decided the other preliminary injunction factors.  It found the question of irreparable harm close because the carriers could not get damages from the state and would lose customer goodwill if they tried to pass to their customers the new charges from the new rule.  *Id.* at *10.  It found that the merged public interest and the balance of equities factors did not favor an injunction because CPUC was trying to save its universal service program with the access line rule.  *Id.* at *11.

## II

"Denial of a motion for a preliminary injunction is reviewed for abuse of discretion and the underlying legal principles de novo."  *Int'l Franchise Ass'n, Inc. v. City of Seattle*, 803 F.3d 389, 398 (9th Cir. 2015).  To qualify for an injunction, the moving party must establish a likelihood of success on the merits, that it will suffer irreparable harm in the absence of injunctive relief, that the balance of the equities tips in its favor, and that the public interest supports relief.  *All. for the Wild Rockies v. Petrick*, 68 F.4th 475, 490 (9th Cir. 2023).  As to the merits, our cases apply a "sliding scale test" that "permits plaintiffs to satisfy this requirement with a 'serious question' on the merits when the balance of hardships tips sharply in their favor."  *Where Do We Go Berkeley v. California Dep't of Transp.*, 32 F.4th 852, 863 (9th Cir. 2022).  Serious questions are issues that "cannot be resolved one way or the other at the hearing on the injunction because they require more deliberative investigation."  *Manrique v. Kolc*, 65 F.4th 1037, 1041 (9th Cir. 2023)

(cleaned up). Thus, parties do not show serious questions when they raise a "merely plausible claim," nor can a district court "forgo legal analysis just because it has not identified precedent that places the question beyond debate." *Where Do We Go Berkeley*, 32 F.4th at 863. This "less demanding" merits standard requires serious factual questions that need to be resolved in the case. *All. for the Wild Rockies*, 68 F.4th at 497.[2] The final two injunction factors—the balance of equities and the public interest—merge where a government agency is a party. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

### III

We conclude that the carriers are unlikely to succeed on the merits of their claims. And "if a movant fails to meet this threshold inquiry, we need not consider the other factors." *California v. Azar*, 911 F.3d 558, 575 (9th Cir. 2018) (internal quotations omitted).

### A

We begin with a word on preemption. Federal regulations can preempt state law. *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 152–53 (1982). We recognize three types of preemption: "express preemption, field preemption, and conflict preemption." *Ass'n des Éleveurs de Canards et d'Oies du Quebec v. Bonta*, 33 F.4th 1107, 1113–14 (9th Cir. 2022). Express preemption "arises 'when the text of a federal statute explicitly manifests Congress's intent to displace state law.'" *Id.* at 1114 (quoting *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1022 (9th Cir. 2013)). Field preemption is when Congress takes exclusive control over a particular issue. *Id.* at 1114.

---

[2] Although the carriers pay lip-service to this lesser merits standard, they do not explain why they succeed under it.

Conflict preemption arises when state law conflicts with federal law, such that "it is impossible for a private party to comply with both state and federal law." *Id.* (citations omitted).

The carriers exclusively argue express preemption.[3] When a statute contains an express preemption clause, we look only to the text "without any presumptive thumb on the scale for or against preemption." *Cal. Rest. Ass'n v. City of Berkeley*, 89 F.4th 1094, 1101 (9th Cir. 2024) (citation omitted).[4]

"[T]he task of statutory construction must in the first instance focus on the plain wording of the [preemption] clause" and then consider "the surrounding statutory framework[.]" *Nat'l R.R. Passenger Corp. v. Su*, 41 F.4th 1147, 1152 (9th Cir. 2022) (citations omitted). Our analysis of the carriers's express-preemption argument thus begins with the Telecommunications Act's text. Section 254(f) preempts state regulations that are "inconsistent with" FCC regulations and that are not "equitable and nondiscriminatory." We treat each in turn.

B

The Telecommunications Act allows states to "adopt regulations not inconsistent with the [FCC]'s rules." 47 U.S.C. § 254(f). The carriers argue that the CPUC rule is

---

[3] We held that there was no conflict preemption the last time the carriers challenged a CPUC rule vis-à-vis this very statute. *See Picker*, 970 F.3d at 1117–20.

[4] The presumption against preemption does not apply when there is an express preemption clause, particularly as here where the statute is not ambiguous. *See Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 579 U.S. 115, 125 (2016); *see also R.J. Reynolds Tobacco Co. v. County of Los Angeles*, 29 F.4th 542, 553 n.6 (9th Cir. 2022).

"inconsistent with" the FCC's rules because it differs from them. They also explain that the FCC considered—and ultimately rejected—a rule functionally equivalent to the CPUC rule they now challenge.

1

To determine when a state regulation is "inconsistent with" a federal regulation, we would normally start by looking at the meaning of "inconsistent" at the time Congress enacted the Telecommunications Act. But we are not working from an entirely blank slate.

Although we have never interpreted § 254(f)'s use of "inconsistent with," in *Metrophones Telecommunications, Inc. v. Global Crossing Telecommunications, Inc.*, we interpreted its use in 47 U.S.C. § 276(c), another provision of the Telecommunications Act. 423 F.3d 1056 (9th Cir. 2005). We first explained that Congress's use of "inconsistent with" "signaled its intent *not* to occupy the entire field." *Metrophones*, 423 F.3d at 1072 (emphasis added). We then concluded that when Congress uses the term "inconsistent with" in an express preemption clause, its meaning is "substantially identical to the analysis of implied conflict preemption." *Id.* at 1073. We thus concluded that state law is only inconsistent with federal law if it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* (quoting *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 98 (1992)). And even then, we explained that state law was only preempted "to the extent it actually interferes with the methods by which the federal regulatory scheme was designed to reach its goal." *Id.* (citations and internal punctuation omitted).

We could rest on *Metrophones* and conclude—as we did there—that Congress's use of "inconsistent with" merely codifies what would otherwise be implied conflict preemption. After all, "identical words and phrases within the same statute should normally be given the same meaning." *Does 1-6 v. Reddit, Inc.*, 51 F.4th 1137, 1143 (9th Cir. 2022) (subsequent history and internal citations omitted). Applied here, it would mean that whenever the Telecommunications Act uses "inconsistent with," it means the same thing.

But we would reach the same conclusion even without the helpful gloss in *Metrophones* because that interpretation is also correct. At the time the Telecommunications Act was enacted, "inconsistent" meant "[m]utually repugnant or contradictory." *Inconsistent*, BLACK'S LAW DICTIONARY 766 (6th ed. 1990). Under that definition, two ideas are inconsistent only if they are "[c]ontrary, the one to the other, so that both cannot stand, but the acceptance or establishment of the one implies the abrogation or abandonment of the other." *Id.* Another definition required "incompatibility of elements" or a lack of "agreement." *Inconsistent*, RANDOM HOUSE WEBSTER'S COLLEGE DICTIONARY 660 (2d ed. 1997).

These contemporary dictionary definitions suggest that the term "inconsistent" requires some level of mutual exclusivity. This is the most intuitive reading. And if dictionaries were not enough, the rest of the statute provides helpful context, as it clarifies that state rules are allowed if they "are paired with 'specific, predictable, and sufficient mechanisms' that 'do not rely on or burden Federal universal service support mechanisms.'" *WWC Holding Co. v. Sopkin*, 488 F.3d 1262, 1277 (10th Cir. 2007) (quoting 47 U.S.C. § 254(f)). The statute's prohibiting reliance on or the

burdening of federal funding mechanisms highlights Congress's key concern in allowing the states to set their own rules for funding universal service within their borders. The words Congress used reflect its desire for states to ensure state-level universal service to best meet their unique needs, but only if they do not harm the FCC's efforts.

Our reading is also consistent with how "inconsistent" is used in other areas of federal law. In *Goldfarb v. Mayor and City Council of Baltimore*, the Fourth Circuit considered a challenge brought under the Resource Conservation and Recovery Act (RCRA) against "current and former owners of an industrial property in Baltimore alleged to have been contaminated by hazardous waste." 791 F.3d 500, 502 (4th Cir. 2015). The RCRA included an "anti-duplication provision" with language remarkably like § 254(f). It provided that if the Clean Water Act (CWA) regulated an activity, that activity cannot also be regulated by the RCRA—"except to the extent that such application (or regulation) is not inconsistent with the requirements" of the CWA, among other statutes. 42 U.S.C. § 6905(a).

Like us, the Fourth Circuit was required to determine what it meant for the RCRA to be "inconsistent with" other provisions of federal law. And like us, the Fourth Circuit gave "inconsistent" "its ordinary dictionary meaning," ultimately concluding that "[t]o be 'inconsistent' for purposes of § 6905(a), . . . the CWA must require something fundamentally at odds with what RCRA would otherwise require." *Goldfarb*, 791 F.3d at 509–10 (collecting dictionary definitions).

In a different challenge interpreting the same statute, the D.C. Circuit faulted a party for claiming that something was "inconsistent with" the Atomic Energy Act while being

"unable to point to any direct conflict between" the challenged position "and any specific provision of the AEA." *Edison Elec. Inst. v. EPA*, 996 F.2d 326, 337 (D.C. Cir. 1993). The carriers here face the same problem. They rely on the undisputed point that the surcharge rule differs from the FCC rule. But that is not enough.

Other examples establishing that "inconsistent" does not mean "different" abound. The Supreme Court has explained that "a later statute repeals former ones when clearly inconsistent with the earlier enactments." *United States v. Yuginovich*, 256 U.S. 450, 463 (1921) (citing *United States v. Tynen*, 78 U.S. (11 Wall.) 88, 93 (1870)). The presumption thus recognizes that two statutes can differ without the later-enacted statute destroying the former. It is only when the two conflict that the former yields.

Likewise, parties are judicially estopped from taking inconsistent litigating positions by litigating on one theory, and then seeking "an inconsistent advantage by pursuing an incompatible theory." 18 C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 4477, p. 782 (1981). Each of these examples, and countless others, point in one direction—"inconsistent" requires more than "different." The carriers provide no reason for us to afford § 254(f)'s definition of "inconsistent" a different understanding from the meaning we apply in other areas of federal law.

Moreover, the cases on which the carriers rely to redefine "inconsistent" to mean "different" require more than mere difference. One such case, *Ecological Rights Foundation v. PG&E Company*, held that "inconsistent with" requires two rules to be "mutually repugnant or contradictory, such that the application of one implies the abrogation or abandonment of the other." 874 F.3d 1083, 1095 (9th Cir.

2017) (cleaned up).    That undermines the carriers's argument.

Their other cited sources fare no better.  Justice Scalia's partial concurrence in *Decker v. Northwest Environmental Defense Center*, for example, explained that "whenever the agency's interpretation of the regulation is different from the fairest reading, it is in that sense 'inconsistent' with the regulation."  568 U.S. 597, 617 (2013) (Scalia, J., concurring in part and dissenting in part).   But the next sentence—omitted from the carriers's briefing—explains that such difference is "[o]bviously . . . not enough."  *Id.*

Thus, even the carriers's cases require a rule to undermine another for the two rules to be inconsistent.  We thus conclude that the Telecommunications Act's use of "inconsistent with" unambiguously requires abrogation or abandonment of the federal rule.

2

Guided by our interpretation of "inconsistent with," we conclude that the carriers have failed to show a likelihood of success on their claim that the access line rule is "inconsistent with" the FCC rule.  The FCC rule—imposed on carriers for funding the federal universal service program—says nothing about the funding of state universal service programs.  And the carriers concede that they cannot prove impossibility preemption.   That concession is fatal given our conclusion in *Metrophones* that when Congress uses "inconsistent with," it invokes conflict preemption.  But even without that concession, the carriers's arguments fail.

First, they argue that a state cannot evade preemption simply by declaring that its own rule is best designed to advance universal service.  We agree, but that is beside the

point.  A state, of course, could never adopt a rule that it determined would harm universal service.  But that speaks more to their obligation under § 254(f) to advance universal service than it does to their obligation to advance universal service consistent with FCC rules.

Next, they argue that the rule undermines the FCC's explicit policy objectives of ensuring that universal service support mechanisms are predictable, competitively neutral, and easily administrable, while avoiding economic distortions.  In support, they cite the FCC's consideration—and ultimate rejection—of its own connections-based rule in 2012.  At the time, the FCC declined to "create a definition of 'connection' for purposes of moving to a new connections-based contribution methodology" without first obtaining industry-wide consensus.  *Universal Serv. Contribution Methodology*, 27 FCC Rcd. 5357, 5439, ¶ 226 (2012).  But that decision does not impose a state-level consensus requirement.  What is good for the goose is not always good for the gander.  We agree with the D.C. Circuit's conclusion—to borrow from Judge Williams's summary—that the FCC can "act[] lawfully in *rejecting*" one action without "each of the 50 states" being similarly required to reject that action.  *Mozilla Corp. v. FCC*, 940 F.3d 1, 95 (D.C. Cir. 2019) (Williams, J., concurring in part and dissenting in part) (emphasis in original).  As we explained above, the relevant question is whether CPUC's adopting a connections-based rule would burden, undermine, or rely on the FCC's universal service efforts. By rejecting an access line rule for funding federal universal service programs, all that the FCC necessarily concluded was that such rules would not work at the federal level. California may conclude otherwise if it can do so without harming the FCC's efforts.

The carriers then argue that the new rule assesses surcharges without distinguishing whether the underlying services are surchargeable. They point to broadband, which is unsurchargeable. But it is not clear that *intrastate* broadband services are unsurchargeable. CPUC explains that the prohibition on such surcharges was ephemeral—the D.C. Circuit rejected the FCC's "effort to kick the States out of intrastate broadband regulation" and vacated its rule prohibiting "any state or local requirements that are inconsistent with [the FCC's] deregulatory approach." *Mozilla Corp.*, 940 F.3d at 74, 81.

The parties dispute whether the D.C. Circuit's *Mozilla* opinion, in vacating the preemption provision, vacated a related FCC conclusion that "any state requirements to contribute to state universal service support mechanisms that might be imposed on such broadband Internet access services would be inconsistent with federal policy and therefore are preempted by section 254(f)." *Protecting & Promoting the Open Internet*, 30 FCC Rcd. 5601, 5837 n.1477 (2015) (*Open Internet Order*). We have our reservations about that conclusion given our holding that "inconsistent with" mirrors the requirements of conflict preemption. The *Open Internet Order* did not conduct a statutory analysis of "inconsistent with" and did not meaningfully address how states would undermine its efforts by surcharging broadband. But we need not wade into that controversy here.

At oral argument, CPUC explained that its definition of access line is limited to voice telecommunications services, meaning that it "does not and cannot surcharge broadband"

services.[5]  Put differently, since CPUC does not surcharge broadband qua broadband, there is no conflict even if the FCC's preemption-by-fiat were lawful.  Thus, the continued validity of the *Open Internet Order*'s preemption of broadband universal service surcharges does not control our analysis.

Finally, the carriers point to *Metrophones*.  There, we considered whether three state-law claims were preempted by the Telecommunications Act.  We concluded that the implied-contract-in-fact and unjust-enrichment claims were not preempted because they cleanly aligned with what the FCC had done.  423 F.3d at 1076.

Things were different for the negligence claim.  We held that it was preempted because it sought to assign liability differently from the FCC's compensation rules.  *Id.* at 1079. By seeking to assign liability to one party where the FCC assigned liability to another, the negligence claim in effect was "inconsistent with" the relevant FCC regulations.  But far from providing the carriers harbor, our conclusion in *Metrophones* only underscores the correctness of our conclusion that two rules must be in conflict— irreconcilable—for one to be "inconsistent with" the other.

---

[5] Moreover, even if the carriers are correct that (1) the access line rule surcharges broadband and (2) that states are preempted from surcharging broadband services—a tall order—they face an additional hurdle.  They raise a facial challenge to the access line rule.  But to answer "whether the CPUC resolutions at issue . . . are facially preempted, we use the 'rules that apply to facial challenges' to statutes."  *Picker*, 970 F.3d at 1122 (quoting *Puente Ariz. v. Arpaio*, 821 F.3d 1098, 1104 (9th Cir. 2016)).  Those rules require the carriers to show that there are "no set of circumstances . . . under which the resolutions were valid."  *Id.* (cleaned up).  They cannot succeed on their facial claim because even if broadband surcharges are preempted, the access line rule does not otherwise conflict with FCC rules.

After all, if the FCC imposed liability on one party for an action, a state law under which the other party would be liable for the same action would directly conflict with the federal law. *Metrophones*, while insightful, thus cuts against the carriers's preemption argument.

*          *          *

The access line rule differs from the FCC's rule funding interstate universal service programs. But the carriers have not shown that it burdens those programs, and they have thus failed to show that they are likely to succeed on their claim that it is inconsistent with those rules.

C

We also reject the carriers's claim that the surcharge rule is preempted because it is inequitable and discriminatory contrary to § 254(f). The FCC interpreted the "equitable and nondiscriminatory" requirement to impose a "principle of competitive neutrality." *In re Fed.-State Joint Board on Universal Serv.*, 12 FCC Rcd. 8776, 8801 (1997).

In *Picker*, we recognized that neutrality means "that universal service support mechanisms and rules neither unfairly advantage nor disadvantage one provider over another, and neither unfairly favor nor disfavor one technology over another." 970 F.3d at 1120 (internal quotations omitted). The keyword there is "unfairly." And though we did not in *Picker*—and do not here—detail all the ways a state could act unfairly to certain providers or technologies, we explained that it would not be unfair for regulators to treat "competitors whose circumstances are materially distinct" differently. *Id.* (internal quotations omitted). We thus recognized, albeit in different words, that whatever else competitive neutrality requires, it "does not

require precise parity of treatment." *Rural Cellular Ass'n v. FCC*, 588 F.3d 1095, 1105 (D.C. Cir. 2009) (quoting *TCG New York, Inc. v. City of White Plains*, 305 F.3d 67, 80 (2d Cir. 2002)).   Like our sister circuits, we conclude that competitive neutrality "only prohibits [states] from treating competitors"—and, by extension, technologies— "differently in 'unfair' ways." *Id.* at 1104.

1

Applying that principle, we conclude that the surcharge rule is not unfairly discriminatory.  The carriers argue that they are harmed more than local exchange carriers.  But the access line rule treats "all customers (wireline, voice over internet protocol, and wireless) regardless of service type" the same and, if anything, is more equitable than the prior rule, under which most of the surcharges came only from ever-dwindling landline services. *Assurance Wireless USA, L.P.*, 2023 WL 2780365, at \*3 (cleaned up).  And it applies to all carriers. *Cf. Alenco Commc'ns, Inc. v. FCC*, 201 F.3d 608, 623 (5th Cir. 2000) ("The Commission reasonably applied the principle of equitable and nondiscriminatory contribution by requiring contributions from all telecommunications providers.").  Even if the carriers are correct that they are more burdened by the surcharge rule than others, that is only because they do not provide as many landline services, and thus were disproportionately benefited by the prior rule.

Nor is it dispositive that the carriers derive more than 75% of their wireless service revenues from unsurchargeable broadband.  As we have already explained, the carriers have not shown a likelihood of success on their claim that broadband is being surcharged at all. *See supra* at 18–19. But more to the point, as CPUC clarified at oral argument,

the surcharge only applies to "voice telecommunication services on a standalone basis" or, if bundled with other services, the "connection to the voice telecommunication service." If most of the carriers's services are not being surcharged, it is hard to see how they are being unfairly discriminated against by the access line rule. And, of course, competitive neutrality "does not prohibit regulators from according different treatment to competitors"—like local exchange carriers and wireless providers such the carriers here—"whose circumstances are materially distinct." *Picker*, 970 F.3d at 1120.

CPUC's course correction, designed to "address the sustainability of the state's universal-service funding[] given the decrease in revenue generated from landline services" is—though far from the only possible response—a fair response to a real problem. *Assurance Wireless USA, L.P.*, 2023 WL 2780365, at *9. In a world of ever-evolving telecommunications technologies, competitive neutrality must allow some play in the joints. To hold otherwise would hamstring California's ability to satisfy its statutory mandate of providing universal service.

2

The carriers also argue that the rule treats providers who receive support under the federal ACP—such as carriers Assurance Wireless and MetroPCS—differently than those who serve low-income participants in the California LifeLine Program.[6] CPUC responds that the LifeLine program and the ACP are not comparable and are funded differently, that the relevant carriers could join LifeLine if

---

[6] This argument was relegated to "a footnote in [the carriers's] opening brief" below. *See id.* at *9. Despite this inadequate briefing, we address it on the merits as the district court did.

they wanted to, and that the prior rule also exempted LifeLine while not exempting those enrolled in the ACP.

We agree with CPUC. The FCC recognizes that ACP is "fundamentally different" than LifeLine. *Rep. on the Future of the Universal Serv. Fund*, 2022 WL 3500217, at \*22 (Aug. 15, 2022). The carriers are quick to point out that this FCC decision was discussing the federal LifeLine program. But they have no answer to CPUC's showing that California's LifeLine program is based on the federal program and so differences between ACP and LifeLine at the federal level exist at the state level as well.

The carriers also try to refute CPUC's showing that the way the two programs, federal ACP and California's LifeLine, is relevant to whether they are "materially distinct" for purposes of the discrimination inquiry. *Picker*, 970 F.3d at 1120. Section 254 deals with the way that the FCC and states fund their universal service programs. But neither the FCC nor the states fund ACP—Congress does. Pub. L. No. 117-58, 135 Stat. 429, 1382 (2021). We disagree with the carriers's claim that the different funding mechanisms lack legal significance. At the very least, the fact that Congress funds ACP but not universal service shows that ACP's different treatment is not forbidden discrimination for purposes of § 254(f). Further, only one member of a given household is eligible for LifeLine benefits. Thus, it is materially distinct from ACP. Given the differences between LifeLine and ACP and that the relevant carriers can always join LifeLine, the carriers's claims fall short of establishing a likelihood of success on their claim that the rule is discriminatory and thus preempted. *See Picker*, 970 F.3d at 1120.

## D

We also briefly note the preliminary nature of our conclusions here.  Our interpretation of what is required for a state rule to be "inconsistent with" FCC rules or inequitable and discriminatory, of course, should govern further consideration on the merits.  But "[w]e have repeatedly emphasized the preliminary nature of preliminary injunction appeals." *Ctr. for Biological Diversity v. Salazar*, 706 F.3d 1085, 1090 (9th Cir. 2013).  Thus, our legal conclusion on what is required to show inconsistency says nothing about what facts—if any—may arise in discovery.

While the carriers have not established a likelihood of success on the merits of their claim that the CPUC rule is actually "inconsistent with" FCC regulations or that it is unfairly discriminatory or inequitable, they may be able to as the case progresses.  Factual development could change the final analysis.  Since the rule has been in effect for over a year, the carriers may have new evidence about how the new rule interacts with FCC rules in practice.  If, for example, the access line rule does surcharge broadband, the district court will be able to conduct, in the first instance, an analysis as to whether the FCC was acting within its authority when it concluded that states were preempted from surcharging broadband—guided by our interpretation of "inconsistent with."  We express no opinion on that question, nor do we prejudge how the fully developed factual record may influence the merits.

## E

Because the carriers have failed to establish a likelihood of success on the merits, they cannot obtain a preliminary injunction.  We have explained that "[l]ikelihood of success on the merits is the most important factor." *Azar*, 911 F.3d

at 575 (cleaned up).  And where, as here, a party fails to meet this "threshold inquiry," we are not even required to address the other factors.  *Id.* (citation omitted).

Likelihood of success on the merits is a necessary precondition to injunctive relief.  Here, that means that the carriers cannot obtain injunctive relief even though we conclude that they face irreparable harm.  No matter how the carriers respond to the surcharge rule, they face harms that damages cannot remedy.  As the district court explained, if the carriers here pass on the surcharge to their customers, they face a loss of goodwill and an injury to their pro-consumer brands.  *See Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 865–66 (9th Cir. 2017).  If, by contrast, the carriers swallow the added access line costs, they will be unable to recover those costs later from California because of its Eleventh Amendment immunity.  U.S. Const. amend. XI.

But this irreparable harm does not help them.  Their failure to show a likelihood of success on the merits precludes injunctive relief.

IV

The district court correctly concluded that the carriers were unlikely to succeed on the merits.  The surcharge rule is not "inconsistent with" federal law, and it is neither unfairly discriminatory nor inequitable.  Because the carriers have failed to show a likelihood of success or serious questions on the merits, they cannot obtain injunctive relief—regardless of the irreparable harm they face.

**AFFIRMED.**