[Cite as *State ex rel. Yost v. Elevate Smoke, L.L.C.*, 2025-Ohio-5652.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

STATE OF OHIO, EX REL. ATTORNEY :      APPEAL NO.    C-250175
GENERAL DAVE YOST,                 TRIAL NO.      A-2403034

       : 

      Plaintiff-Appellant,

       :

   vs.

       :                *JUDGMENT ENTRY*

ELEVATE SMOKE, LLC, d.b.a. ELEV8
SMOKE SHOP,                  :

      Defendant-Appellee.        :

This cause was heard upon the appeal, the record, the briefs, and arguments.

For the reasons set forth in the Opinion filed this date, the judgment of the trial court is affirmed.

Further, the court holds that there were reasonable grounds for this appeal, allows no penalty, and orders that costs be taxed under App.R. 24.

The court further orders that (1) a copy of this Judgment with a copy of the Opinion attached constitutes the mandate, and (2) the mandate be sent to the trial court for execution under App.R. 27.

**To the clerk:**

**Enter upon the journal of the court on 12/19/2025 per order of the court.**

By:_____
        **Administrative Judge**

[Cite as *State ex rel. Yost v. Elevate Smoke, L.L.C.*, 2025-Ohio-5652.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, EX REL. ATTORNEY GENERAL DAVE YOST, | : | APPEAL NO.  C-250175<br>TRIAL NO.   A-2403034 |
| Plaintiff-Appellant, | : | |
| | : | |
| vs. | : | |
| | : | *O P I N I O N* |
| ELEVATE SMOKE, LLC, d.b.a. ELEV8 SMOKE SHOP, | : | |
| | : | |
| Defendant-Appellee. | : | |

Civil Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: December 19, 2025

*Dave Yost*, Attorney General of Ohio, and *Drew A. Smith,* Senior Assistant Attorney General, for Plaintiff-Appellant,

*Thompson Hine, LLP, James C. Fraser, Eric N. Heyer* and *Benjamin G. Sandlin*, for Defendant-Appellee.

**Bock, Judge.**

{¶1} Recognizing the scourge of America's tobacco addiction, Congress passed the Family Smoking Prevention and Tobacco Control Act ("TCA"), which subjects electronic cigarettes[1] ("e-cigarettes") and other tobacco products to the Food and Drug Administration's ("FDA") regulatory authority. Under the TCA, manufacturers must seek authorization from the FDA before marketing a new e-cigarette to the public. And e-cigarette labels, packaging, and shipping containers must state, "sale only allowed in the United States" ("Origin Label"). This appeal concerns the interplay between these statutory directives, and the federal law's explicit and implicit preemption of state authority over tobacco products.

{¶2} Specifically, we must decide whether the TCA explicitly or implicitly preempts plaintiff-appellant State of Ohio, ex rel. Attorney General Dave Yost's ("State") claims, which allege that the sale of unauthorized e-cigarettes bearing the Origin Label are deceptive and unconscionable sales practices in violation of Ohio's consumer-protection laws. We hold that the TCA implicitly preempts the State's claims because they exist solely by virtue of the TCA's premarket-authorization requirements and conflict with the TCA's labeling requirements.

{¶3} We overrule the State's assignments of error and affirm the trial court's grant of summary judgment.

### I. Factual and Procedural History

{¶4} According to the facts alleged in the complaint, defendant-appellee Elevate Smoke, LLC, d.b.a. Elev8 Smoke Shop ("Elevate Smoke"), sells tobacco products, including e-cigarettes, in Norwood, Ohio.

---

[1] Electronic cigarettes are devices that vaporize a liquid mixture of nicotine, "flavorings," and other chemicals for the user to inhale. *See* 81 Fed.Reg. 28974, 29029 (May 10, 2016).

**{¶5}** Citing the health risks posed by e-cigarettes and their popularity, the Ohio Attorney General's Office of Consumer Protection warned Elevate Smoke, in writing, that retail tobacco stores may be liable under the Ohio Consumer Sales Practices Act ("CSPA"), R.C. 1345.02, for "holding out" for sale any unauthorized e-cigarette that bears the Origin Label.

**{¶6}** After an investigator for the attorney general's office bought from Elevate Smoke "Mr. Fog Max Air" and "EB Create, BC5000," two unauthorized e-cigarettes bearing the Origin Label, the State sued Elevate Smoke in a four-count complaint, seeking a declaratory judgment and a permanent injunction. The State alleged that the sale of unauthorized e-cigarettes constituted a deceptive sales act in Count 1 and an unconscionable sales act in Count 2. It alleged that selling unauthorized e-cigarettes bearing the Origin Label was a deceptive sales act in Counts 1 and 4, and an unconscionable sales act in Count 2. Finally, the State alleged that Elevate Smoke's failure to disclose the e-cigarettes' unauthorized status constituted a deceptive sales act in Count 1 and violated Elevate Smoke's duty to disclose under Ohio's administrative code in Count 3.

**{¶7}** Elevate Smoke moved to dismiss the complaint, arguing that federal law expressly and implicitly preempted the State's Ohio law claims. It attached evidence to its motion. The trial court converted Elevate Smoke's motion to dismiss to a motion for summary judgment. The State filed supplemental evidence.

**{¶8}** The trial court granted summary judgment in Elevate Smoke's favor and found that federal law preempted the State's claims and that the State failed to "state a claim upon which relief can be granted." The State appeals.

## II. Analysis

**{¶9}** The State challenges the trial court's judgment in two assignments of error. First, the State argues that the trial court applied the wrong standard for reviewing Elevate Smoke's converted motion. Second, the State maintains that claims under the CSPA are not preempted by federal law.

## A. *The trial court's citation to the standard for dismissal under Civ.R. 12(B)(6) was harmless error*

**{¶10}** The State argues that the trial court improperly analyzed the converted motion under the standard for reviewing a motion for dismissal under Civ.R. 12(B)(6). It insists that the trial court should have determined that a genuine issue of material fact exists precluding summary judgment.

**{¶11}** When deciding a Civ.R. 12(B)(6) motion to dismiss, a court must accept the allegations in the complaint as true and decide whether the complaint alleges facts that would entitle the plaintiff to relief. *See Plush v. City of Cincinnati,* 2020-Ohio-6713, ¶ 12 (1st Dist.). To that end, Civ.R. 12(B)(6) provides the proper means to resolve legal questions at an early stage. *See Neitzke v. Williams*, 490 U.S. 319, 326 (1989) (explaining that "[Fed.R.Civ.P.] 12(b)(6) authorizes a court to dismiss a claim on the basis of a dispositive issue of law.").

**{¶12}** A court considering a motion to dismiss "is confined to the allegations in the complaint." *Plush* at ¶ 12. While a court may take judicial notice when deciding a motion to dismiss in some situations, a court may not rely on evidence to decide the motion. *See Fontain v. Sandhu,* 2019-Ohio-2750, ¶ 20 (1st Dist.). If a motion to dismiss relies on evidence or matters outside of the pleadings, a court must "disregard extraneous material or [] convert a motion to dismiss into a motion for summary judgment." *Keller v. City of Columbus*, 2003-Ohio-5599, ¶ 18; *see* Civ.R. 12(B).

**{¶13}** Here, the trial court converted Elevate Smoke's Civ.R. 12(B) motion to a summary-judgment motion based on the extraneous materials attached to the motion. At that point, Civ.R. 12(B) directed the court to dispose of the motion "as provided in [Civ.R.] 56" and give the parties a "reasonable opportunity" to present all permitted materials.

**{¶14}** To grant a summary-judgment motion, a court must construe the evidence in the nonmoving party's favor, find that no genuine issues of material fact exist, and conclude that the moving party is entitled to a judgment as a matter of law. *See Uren v. Scoville,* 2021-Ohio-3425, ¶ 12 (1st Dist.). Summary judgment is designed to assess the parties' evidence and "determine whether triable issues of fact exist." *Walker v. Hodge*, 2008-Ohio-6828, ¶ 19 (1st Dist.). And when a trial court finds that no triable issues of fact exist, summary judgment is "an abbreviated mechanism of resolving disputes" of law. *Beswick Group. N. Am., LLC, v. W. Reserve Realty, LLC,* 2017-Ohio-2853, ¶ 12 (8th Dist.).

**{¶15}** We agree with the State that the trial court cited the wrong standard, but we hold that the error was harmless. The trial court converted Elevate Smoke's motion to dismiss into a motion for summary judgment, referenced that conversion in its decision, but cited the motion-to-dismiss standard and Civ.R. 12(B)(6) when it granted Elevate Smoke's motion and dismissed the State's complaint. To the extent that the trial court relied on the wrong standard for reviewing a motion for summary judgment, it erred.

**{¶16}** But the trial court's error was harmless. *See Strama v. Allstate Ins. Co.,* 2015-Ohio-2590, ¶ 43 (7th Dist.). The only issues decided below, and presented to this court for appeal, are issues of law, not fact. Indeed, Elevate Smoke did not dispute the State's factual allegations about the relevant tobacco products' unauthorized statuses.

The State contends that a genuine issue of material fact exists as to whether the TCA mandates that "illegal," or unauthorized, tobacco products must bear the Origin Label. But the answer to that question lies in the statutory text, and the meaning of a statute is a question of law for the court to decide. *See Vontz v. Miller,* 2016-Ohio-8477, ¶ 26 (1st Dist.). And the ultimate issue in this case—preemption—is a question of law. *See State v. CSX Transp., Inc.,* 2022-Ohio-2832, ¶ 11, citing *Merck Sharp & Dohme Corp. v. Albrecht,* 387 U.S. 299, 302 (2019). Because the issues before the trial court were legal, and not factual, the trial court's error was harmless.

{**¶17**}   The State also argues that the trial court committed reversible error by considering Elevate Smoke's inadmissible evidence. But there is no indication that the trial court relied on this evidence when it decided Elevate Smoke's motion.

{**¶18**}   In conclusion, the trial court's erroneous use of the motion-to-dismiss standard was harmless because the converted motion for summary judgment raised legal, not factual, issues. We overrule the State's first assignment of error.

## B.  *The TCA preempts the State's claims*

{**¶19**}   In its next assignment of error, the State argues that the trial court erred when it granted judgment on its claims under the CSPA as preempted by the TCA. We review the trial court's grant of summary judgment, and issues of law, de novo. *City of Cincinnati v. State,* 2022-Ohio-1019, ¶ 8 (1st Dist.).

### 1.  *Federal regulation of tobacco products*

#### a.  History

{**¶20**}   In 1906, Congress passed the Pure Food and Drug Act, the nation's "first significant public health law," which "prohibited the manufacture or interstate shipment of adulterated or misbranded drugs [and] supplemented the protection for consumers already provided by state regulation and common-law liability." *Wyeth v.*

7

*Levine,* 555 U.S. 555, 567 (2009); *see* Pub.L. No. 59-384, 34 Stat. 768 (2009). Due to flaws in the law and "unsafe drugs and fraudulent marketing," Congress enacted the Federal Food, Drug, and Cosmetic Act ("FDCA") in 1938 to supplant the Pure Food and Drug Act. *See id.; see also Zyla Life Sciences, LLC v. Wells Pharma of Houston, LLC*, 134 F.4th 326 (5th Cir. 2025).

{¶21} In 1995, the FDA grew concerned with the "availability and attractiveness of tobacco products to young people." *FDA v. Brown & Williamson Tobacco Corp.,* 529 U.S. 120, 126 (2000). The FDA tried to restrict the sale, distribution, and marketing of tobacco products as regulations of "drugs" and "devices" under the FDCA. *Id.* But the Supreme Court of the United States held that the FDA lacked jurisdiction to regulate tobacco products under the FDCA. *Id.* at 125.

{¶22} Congress responded in 2009 with the TCA, 21 U.S.C. 387 et seq, which amended the FDCA, abrogated *Brown,* and empowered the FDA to regulate tobacco products. *See* Pub.L. No. 111-31, 123 Stat. 1776 (2009); *see also Big Time Vapes, Inc., v. FDA* 963 F.3d 436, 437, fn. 1 (5th Cir. 2001). When it enacted the TCA, Congress found that the use of tobacco by children is "a pediatric disease of considerable proportions." Pub.L. No. 111-31, 123 Stat. at 1777. It found that "[t]obacco use is the foremost preventable cause of premature death in America." *Id.* And Congress was concerned that Tobacco advertising targets minors and "often misleadingly portrays the use of tobacco as socially acceptable and healthful to minors." *Id.* In that regard, the TCA sought to ensure that consumers were "better informed." *Id.* The TCA was meant to "authorize the [FDA] to set national standards controlling the manufacture of tobacco products." *Id.* at 1782. Under the TCA, the FDA has both power to enforce the law and to oversee "the tobacco industry's efforts to develop, introduce, and promote less harmful tobacco products." *Id.*

**{¶23}** Congress also noted that "[t]obacco products have been used to facilitate and finance criminal activities both domestically and internationally." *Id.* at 1779. So, Congress passed the TCA to "strengthen protections against illicit trade in tobacco products." *See* H.Rep. 111-58, 2009 USSCAN 468 (2009).

**{¶24}** All told, the FDA has "the power to regulate the manufacturing, marketing, sale, and distribution of tobacco products." *FDA v. Wages & White Lion Invests., LLC,* 604 U.S. 542, 551 (2025).

**{¶25}** Initially, e-cigarettes were not considered "tobacco products" and therefore were not within the scope of the TCA. *See FDA v. R.J. Reynolds Vapor Co.,* 606 U.S. 226, 228 (2025). But the dramatic rise of e-cigarette use by middle school, high school, and college students across the country from 2011 to 2014 prompted the FDA to act. *Id.*; *see* 81 Fed.Reg. 29028, 28984. In 2016, "the FDA issued a rule deeming e-cigarettes and e-liquids to be 'tobacco products,'" bringing e-cigarettes under the FDA's regulatory control. *R.J. Reynolds Vapor Co.* at 228 citing 81 Fed.Reg. 29028.

### b. Front-end enforcement

**{¶26}** Under the TCA, manufacturers introducing e-cigarettes and other tobacco products that were "not commercially marketed in the United States as of February 15, 2007" must apply to the FDA for premarket authorization of the product. *See* 21 U.S.C. 387j(a); *see also* 21 C.F.R. 1114.5. Premarket authorization acts as the lynchpin for the FDA's enforcement powers under the TCA for new tobacco products.

**{¶27}** As a front-end enforcement measure, premarket authorization allows the FDA to assume a gatekeeping role when it reviews manufacturers' premarket-authorization applications seeking to introduce an e-cigarette into the market. *See* 21 C.F.R. 1114.5. All tobacco products seeking premarket authorization are subjected to

"a rigorous scientific review process." *NJOY, LLC v. Imiracle (HK) Ltd.*, 760 F. Supp.3d 1084, 1096 (S.D.Cal. 2024). In addition to the product itself, the premarket-application review process requires the FDA to scrutinize the tobacco product's labels and marketing plans. *See* 21 U.S.C. 387j(b)(1); *see also* 21 C.F.R. 1114.7(a) and (f).

**{¶28}** A successful application will result in "an order that the new product may be introduced or delivered for introduction into interstate commerce." 21 U.S.C. 387j(c)(1)(A)(i). If the authorization application is denied, the FDA will "issue an order that the new product may not be introduced or delivered for introduction into interstate commerce." 21 U.S.C. 387j(c)(1)(A)(ii).

c. Back-end enforcement

**{¶29}** The TCA prohibits the introduction of "adulterated" or "misbranded" tobacco products into interstate commerce. 21 U.S.C. 311(a). A tobacco product marketed without the TCA-required FDA authorization renders it adulterated. 21 U.S.C. 387b(6)(a). A tobacco product is mislabeled if it lacks the Origin Label. 21 U.S.C. 387c(a)(2)(D), citing 21 U.S.C. 387t(a). The TCA also prohibits the use of misleading statements or representations, whether express or implied, that would lead consumers to believe that the FDA approved, deemed safe, or endorsed a tobacco product. 21 U.S.C. 331(tt)(1)-(4); *see also* 21 U.S.C. 387c(a)(1).

**{¶30}** For violations of the TCA, the FDA can seek injunctive relief or "stiff penalties" provided by the FDCA. *White Lion Invests.*, 604 U.S. at 555, citing 21 U.S.C. 333(a)(1) and (f)(9); *see* 21 U.S.C. 332. With some limited exceptions, all proceedings to enforce any provision of the FDCA, including the TCA, "shall be by and in the name of the United States." 21 U.S.C. 337(a).

**{¶31}** Given the popularity of e-cigarettes, the FDA deferred enforcement of the TCA's premarket-authorization requirements until 2022. *See R.J. Reynolds Vapor*

*Co.*, 606 U.S. at 229. But public-health and medical-advocacy organizations successfully sued the FDA in federal court under the theory that the agency's deferred enforcement violated the TCA and Administrative Procedure Act. *See Am. Academy of Pediatrics v. FDA*, 379 F.Supp.3d 461, 492 (D.Md. 2019) (the "FDA's across-the-board suspension of the Tobacco Control Act's premarket approval process, with regard to applications, substantial equivalence reports, exemption requests, approval and enforcement of these requirements, amounts to a rule amendment or revocation, as it is inconsistent with the [TCA]."). In 2020, when that decision was pending on appeal to the Fourth Circuit, the FDA coincidentally issued guidance advising e-cigarette manufacturers that it began prioritizing enforcement of the TCA's premarket authorization. *See Vapor Technology Assn. v. United States FDA*, 977 F.3d 496, 500 (6th Cir. 2020).

{¶32} After a series of pandemic-related extensions and staggered application deadlines, the FDA began reviewing e-cigarette premarket-authorization applications. *See Wisconsinites for Alternatives to Smoking & Tobacco, Inc. v. Casey,* 2025 U.S. Dist. LEXIS 173845, *4 (W.D.Wis. Sep. 5, 2025). As of November 2025, the FDA had reviewed more than 26 million e-cigarette premarket-authorization applications and granted marketing orders for just 39 e-cigarettes. *Id.*

2. *The State's CSPA claims*

{¶33} At issue are the State's claims under the CSPA and sections of its administrative code governing acts or trade practices in consumer transactions. The CSPA "is a remedial law, designed to compensate for inadequate traditional consumer remedies." *Frank v. WNB Group*, 2019-Ohio-1687, ¶ 13 (1st Dist.). The State sought injunctive relief and a declaratory judgment for alleged violations of R.C. 1345.02(A), (B)(1) and (B)(4), and 1345.03(A) and (B)(1).

a. Count 1: deceptive sale practices

**{¶34}** The State asserts in Count 1 of its complaint that Elevate Smoke deceived its customers when it sold (1) unauthorized e-cigarettes, (2) unauthorized e-cigarettes that bear the Origin Label, and (3) unauthorized e-cigarettes that bear the Origin Label without warning consumers that, despite the Origin Label, the e-cigarettes were not authorized for sale.

**{¶35}** The CSPA prohibits "unfair or deceptive act[s] in connection with a consumer transaction" regardless of "whether it occurs before, during, or after the transaction." R.C. 1345.02(A). An act is "unfair" or "deceptive" under the CSPA if it "'mislead[s] consumers about the nature of the product they are receiving.'" *Loury v. Westside Auto. Group*, 2022-Ohio-3673, ¶ 23 (8th Dist.), quoting *Johnson v. Microsoft Corp.*, 2005-Ohio-4985, ¶ 24. The test for a deceptive act "'"'is one of fairness; the act need not rise to the level of fraud, negligence, or breach of contract'"'" to violate the CSPA. *Shumaker v. Hamilton Chevrolet Inc.,* 2009-Ohio-5263, ¶ 19 (4th Dist.), quoting *McPhillips v. United States Tennis Assn. Midwest*, 2007-Ohio-3594, ¶ 27 (11th Dist.), quoting *Chesnut v. Progressive Cas. Ins. Co.*, 2006-Ohio-2080, ¶ 23 (8th Dist.), quoting *Mannix v. DCB Serv., Inc.,* 2004-Ohio-6672, ¶ 18 (2d Dist.).

**{¶36}** An act is deceptive when it suggests "[t]hat the subject of a consumer transaction has sponsorship, approval, performance characteristics, accessories, uses, or benefits that it does not have." R.C. 1345.02(B)(1). An act is also deceptive if it represents "[t]hat the subject of a consumer transaction is available to the consumer for a reason that does not exist." R.C. 1345.02(B)(4).

b. <u>Count 2: unconscionable sale practices</u>

**{¶37}** The State's second count alleged that Elevate Smoke committed unconscionable sales acts when it sold unauthorized e-cigarettes and when it took advantage of consumers' inability to know that the e-cigarettes were unauthorized.

**{¶38}** The CPSA prohibits "unconscionable act[s] or practice[s] . . . before, during, or after [a consumer] transaction." R.C. 1345.03(A). An act is "unconscionable" if the supplier "'manipulat[es] a consumer's understanding of the nature of the transaction at issue.'" *Loury* at ¶ 23, quoting *Johnson* at ¶ 24. Among the several factors for determining whether an act is unconscionable is if "the supplier has knowingly taken advantage of the inability of the consumer to reasonably protect the consumer's interests because of the consumer's . . . ignorance . . . or inability to understand the language of an agreement." R.C. 1345.03(B)(1).

c. <u>Count 3: deceptive sale and advertisement practices</u>

**{¶39}** In Count 3, the State alleged that Elevate Smoke committed a deceptive sales act and violated an administrative rule governing advertisements when it failed to disclose the e-cigarettes' unauthorized statuses.

**{¶40}** The CSPA confers authority on the Ohio Attorney General to issue rules defining acts and practices that violate the CSPA, protecting consumers from suppliers, and encouraging fair consumer sales practices. *See* R.C. 1345.05(B) and Adm.Code 109:4-3-01(A). Under Adm.Code 109:4-3-02(A)(1), a supplier commits a deceptive act during a sale or offer if it "offer[s] in written or printed advertising or promotional literature without stating clearly and conspicuously in close proximity to the words stating the offer any material exclusions, reservations, limitations, modifications, or conditions." The supplier must disclose information in a manner

that is "sufficiently specific so as to leave no reasonable probability that the terms of the offer might be misunderstood." Adm.Code 109:4-3-02(A)(1).

d. Count 4: unfair sale and advertisement practices

**{¶41}** The State's final count alleged that Elevate Smoke committed an unfair or deceptive sales act and violated an administrative rule governing advertisements by representing to consumers that the e-cigarettes could be lawfully sold without having a basis for that belief.

**{¶42}** A supplier commits a deceptive act or practice in a transaction if it represents, claims, or asserts a fact that

would cause a reasonable consumer to believe such statements are true, unless, at the time such representations, claims, or assertions are made, the supplier possesses or relies upon a reasonable basis in fact such as factual, objective, quantifiable, clinical or scientific data or other competent and reliable evidence which substantiates such representations, claims, or assertions of fact.

Adm.Code 109:4-3-10(A).

*3. General preemption principles*

**{¶43}** The Supremacy Clause of the United States Constitution provides that "the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land." U.S. Const., art. VI, cl. 2. Congress, under the Supremacy Clause, "has the power to preempt state law." *Crosby v. Natl. Foreign Trade Council*, 530 U.S. 363, 372 (2000). Congress, by enacting legislation within the bounds of its constitutional authority, has the power to "impose its will on the States." *Gregory v. Ashcroft,* 501 U.S. 452, 460 (1991). The Supremacy Clause preempts state laws that "interfer[e] with, and [are] contrary to, an act of Congress passed in

pursuance of the constitution." *Gibbons v. Ogden,* 22 U.S. 1, 207 (1824). To the extent that state and federal law conflicts, the state law is "'without effect.'" *Mut. Pharmaceutical Co. v. Bartlett*, 570 U.S. 472, 479-480 (2013).

**{¶44}** In any preemption case, "'the purpose of Congress is the ultimate touchstone.'" *Medtronic, Inc., v. Lohr*, 518 U.S. 470, 485 (1996), quoting *Retail Clerks v. Schermerhorn,* 375 U.S. 96, 103 (1963). While Congress may impose its will on the states under the Supremacy Clause, "'Congress does not exercise lightly' the 'extraordinary power' to 'legislate in areas traditionally regulated by the States.'" *Arizona v. Inter Tribal Council of Arizona, Inc.,* 570 U.S. 1, 13 (2013), quoting *Gregory* at 460.

**{¶45}** The State's claims implicate areas that traditionally fell under the State's authority via its police powers—tobacco, health, and consumer protection. *See Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 150 (1963); *see also Hillsborough Cnty., Florida v. Automated Med. Laboratories, Inc.,* 471 U.S. 707, 715 (1985); *R.J. Reynolds*, 29 F.4th at 549. So "we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947).

**{¶46}** Federal law may preempt state law or state action in one of three ways—by "conflict," "express," or "field" preemption. *Murphy v. NCAA*, 584 U.S. 453, 477 (2018), quoting *English v. General Elec. Co.*, 296 U.S. 72, 78-79 (1990). We address the parties' arguments in turn.

*4. Express preemption*

**{¶47}** The parties dispute whether the text of TCA's preemption clause expressly preempts the State's causes of action.

a. Express preemption defined

**{¶48}** Express preemption occurs when "Congress [] define[s] explicitly the extent to which its enactments pre-empt state law." *English* at 78. Congress need not use any particular words or phrases to preempt state law. *Coventry Health Care of Missouri, Inc. v. Nevils*, 581 U.S. 87, 99 (2017). When a statute contains a preemption clause, "'there is no need to infer congressional intent to pre-empt state laws from the substantive provisions of the legislation.'" *Cipollone v. Liggett Group*, 505 U.S. 504, 517 (1992), quoting *California Fed. S. & L. Assn. v. Guerra*, 479 U.S. 272, 282 (1987).

**{¶49}** A court's preemption analysis is, fundamentally, a matter of statutory construction. *See Assurance Wireless USA, L.P. v. Reynolds*, 100 F.4th 1024, (9th Cir. 2024). Preemption provisions in a statute "impl[y] that matters beyond that reach are not pre-empted." *Id.* When Congress includes preempting language in a statute, "we do not invoke any presumption against preemption but instead 'focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' preemptive intent.'" *Puerto Rico v. Franklin California Tax-Free Trust*, 579 U.S. 115, 125 (2016), quoting *Chamber of Commerce of United States of America v. Whiting*, 563 U.S. 582, 594 (2011). When reading a statute, context matters. *King v. Burwell*, 576 U.S. 473, 475 (2015). So, we must "'give effect, if possible, to every clause and word of a statute.'" *United States v. Menasche*, 348 U.S. 528, 538-539 (1955), quoting *Montclair v. Ramsdell*, 107 U.S. 147, 152 (1883).

b. The TCA's preemption framework

**{¶50}** We begin with the text of 21 U.S.C. 387p, the TCA's "unique tripartite preemption" provision. *R.J. Reynolds*, 29 F.4th at 547. Under 21 U.S.C. 387p, the TCA "balances state and federal power over tobacco regulation" in three complementary provisions. The provisions first broadly preserve state authority, then preempt state

authority over some aspects of tobacco products, and then exempt other aspects of tobacco regulation from the preemption clause. *Id.* In this respect, 21 U.S.C. 387p represents an "explicit decision to preserve for the states a robust role in regulating, and even banning, sales of tobacco products." *U.S. Smokeless Tobacco Mfg. Co. v. City of New York*, 708 F.3d 428, 436 (2d Cir. 2013).

> ### *i. TCA's preservation clause reserves states' role in regulating the sale of tobacco products*

**{¶51}** The TCA preservation clause leaves state, local, and tribal governments free to impose and enforce requirements that are more demanding than the TCA:

> Except as provided in [the preemption clause], nothing in this subchapter . . . shall be construed to limit the authority of . . . a State . . . to enact, adopt, promulgate, and enforce any law, rule, regulation, or other measure with respect to tobacco products that is in addition to, or more stringent than, requirements established under this chapter, including a law, rule, regulation, or other measure relating to or prohibiting the sale, distribution, possession, exposure to, access to, advertising and promotion of, or use of tobacco products by individuals of any age, information reporting to the State, or measures relating to fire safety standards for tobacco products.

21 U.S.C. 387p(a)(1).

> ### *ii. TCA's preemption clause prohibits different or additional labeling requirements*

**{¶52}** Next, the preemption clause "expressly overrides the preservation clause in the case of any conflict between the two provision's [sic] terms." *R.J. Reynolds Tobacco Co.*, 29 F.4th at 551. The preemption clause prohibits state and local governments from exercising certain types of tobacco regulation:

No State or political subdivision of a State may establish or continue in effect with respect to a tobacco product any requirement which is different from, or in addition to, any requirement under the provisions of this chapter relating to tobacco product standards, premarket review, adulteration, branding, labeling, registration, good manufacturing standards, or modified risk tobacco products.

21 U.S.C. 387p(a)(2)(A).

**{¶53}** Relevant here, the TCA's preemption clause prevents state enforcement of any "requirement" related to "labeling" that is different from, or in addition to, the TCA's labeling standards. A "requirement" is "a rule of law that must be obeyed." *Bates v. Dow Agrosciences L.L.C.*, 544 U.S. 431, 445 (2005). The *Bates* Court addressed a preemption clause contained in a federal pesticide statute, which prohibited states from imposing or enforcing "'any requirements for labeling or packaging in addition to or different from'" federal law. *Id.* at 443, quoting 7 U.S.C. 136b(b). The *Bates* Court explained that the word "requirements," as used in preemption clauses, "reach[es] beyond positive enactments" and includes even "common law" duties. *Id.*

**{¶54}** The FDCA defines "labeling" as "all labels and other written, printed, or graphic matters (1) upon any article or any of its containers or wrappers, or (2) accompanying such article." 21 U.S.C. 321(m). A different or additional "requirement" is preempted only if it "relate[s] to" the TCA's labeling requirement. The phrase "relating to" suggests that Congress intended "to pre-empt a large area of state law to further its purpose." *Altria Group, Inc. v. Good*, 555 U.S. 70, 85 (2008). Indeed, "'relating to' has a broad[] scope . . . [and] is synonymous with 'having a connection with.'" *Id.* at 86, quoting *Morales v. Trans World Airlines, Inc.,* 504 U.S. 374, 384 (1992).

*iii. TCA's savings clause exempts requirements relating to tobacco-product sales from preemption*

**{¶55}** The TCA's preemption clause itself is limited by a savings clause, which provides that the preemption clause "does not apply to requirements relating to the sale, distribution, possession, information reporting to the State, exposure to, access to, the advertising and promotion of, or use of, tobacco products by individuals of any age, or relating to fire safety standards for tobacco products." 21 U.S.C. 387p(a)(2)(B).

**{¶56}** The savings clause "leav[es] adequate room for state [] law to operate." *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 868 (2000). Of course, the preemption and savings clauses must be read in tandem. *Id.* And as a general rule, savings clauses must not be read so broadly to "upset the careful regulatory scheme established by federal law." *United States v. Locke*, 529 U.S. 89, 106 (2000).

**{¶57}** All told, the TCA shifted authority over tobacco manufacturing and marketing to the federal government, "while still preserving states and localities' broad power over regulation of the sales of those products." *R.J. Reynolds Tobacco*, 29 F.4th at 555; *see U.S. Smokeless,* 708 F.3d at 435. As such, a state requirement that falls under the TCA's preemption clause is not preempted if it relates to an aspect of a tobacco product identified by the savings clause. *See U.S. Smokeless* at 435 (holding that an ordinance limiting flavored tobacco products sales, construed as a "product standard" subject to the preemption clause, is a sales requirement under the savings clause and therefore not preempted by the TCA).

c. <u>TCA's savings clause exempts some of the State's claims from express preemption</u>

**{¶58}** Some of the State's claims in Counts 1 and 3 would impose additional labeling requirements on tobacco products. The State's claims in those counts are based on the allegedly misleading nature of the Origin Label and Elevate Smoke's

failure to warn consumers that, despite the Origin Label allegedly suggesting otherwise, the FDA has not authorized those e-cigarettes for sale.

**{¶59}** One court has ruled that claims against a retailer for failing to warn consumers about a tobacco product's authorization status amounts to "a labeling duty 'different from, or in addition to,' the [TCA's] requirements." *Yimam v. Mylé Vape, Inc.,* 2020 D.C. Super. LEXIS *7, 11 (D.C. June 11, 2020). And just last year, a federal district court ruled that claims under California's consumer-protection law, based on the allegedly misleading Origin Label, were preempted because "what is, and what is not, included on the product's label" was the basis of liability. *NJOY, LLC v. Imiracle (HK) Ltd.,* 760 F. Supp.3d 1084, 1095-1096 (S.D.Cal. 2024).

**{¶60}** To the extent that the State's claims would require warnings in the form of written or graphic material accompanying the e-cigarettes, those warnings would fall within the scope of the FDCA's definition of labeling. But because those warnings would be required at the retail stage, the State's claims are "related to" the sale of tobacco products and fall within the scope of the savings clause. *See* 21 U.S.C. 387p(a)(2)(B). The savings clause exempts the State's claims from the preemption clause's reach.

**{¶61}** In sum, the State's claims under the CSPA that would require accompanying written or graphic materials at the point of sale to counteract the allegedly misleading Origin Label fall within the scope of the TCA's savings clause and are not expressly preempted by federal law. But that does not end the inquiry because "neither an express pre-emption provision nor a saving clause 'bars the ordinary working of conflict pre-emption principles.'" *Buckman Co. v. Plaintiffs' Legal Commt.,* 531 U.S. 341, 352 (2001), quoting *Geier,* 529 U.S. at 869.

5. *The State claims conflict with the TCA*

**{¶62}** Even if a federal statute does not expressly preempt a state law, federal law may implicitly preempt a state law "through 'field' pre-emption or 'conflict' pre-emption." *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 377 (2015).

### a. Conflict preemption, defined

**{¶63}** When state and federal laws conflict, state law is preempted. *Oneok* at 377. But federal law does not preempt state law "simply because in a hypothetical situation a private party's compliance with the [state] statute might cause him to violate the [federal] laws." *Rice v. Norman Williams Co.*, 458 U.S. 654, 659 (1982). Instead, conflicts exist "where 'compliance with both state and federal law is impossible.'" *Oneok* at 377, quoting *California v. ARC Am. Corp.*, 490 U.S. 93, 100 (1989).

**{¶64}** In "impossibility" cases, courts ask "whether the private party could independently do under federal law what state law requires of it." *Pliva, Inc. v. Mensing*, 564 U.S. 604, 619 (2011). A state law conflicts with federal law, and is therefore preempted, when compliance with state law would result in a per se violation of federal law. *Rice* at 458.

### b. *Buckman* and implied preemption under the FDCA

**{¶65}** The trial court ruled that the FDCA preempts the State's claims under *Buckman,* because the State's claims "would not exist in the absence of the FDCA." The parties dispute whether and how *Buckman* applies to the State's claims. We note that after the parties' oral argument in this appeal, the Fifth District released *State ex rel. Atty. Gen. Dave Yost v. Cent. Tobacco & Stuff Inc.*, 2025-Ohio-4613 (5th Dist.), which held that *Buckman* preempted claims against another tobacco retailer that are identical to the CSPA claims in this case.

**{¶66}** In *Buckman,* the Supreme Court of the United States considered whether the FDCA preempted state-law claims alleging that, but for misrepresentations in an application for premarket authorization of orthopedic bone screws, the screws would not have been approved, and the screws would not have injured the patients. *Buckman,* 531 U.S. at 343. The *Buckman* Court held that the state-law claims were implicitly preempted by the FDCA and the Medical Device Amendment of 1976, reasoning that "[s]tate fraud-on-the-FDA claims" encroached on the FDA's responsibility to police fraud and those claims "exist solely by virtue of the FDCA disclosure requirements." *Id.* at 350-353. Plus, the FDCA provided that, except for state enforcement of some food-labeling standards, "all such proceedings for the enforcement, or to restrain violations, of [the FDCA] shall be by and in the name of the United States." 21 U.S.C. 337(a). The *Buckman* Court considered that statutory language to be "clear evidence that Congress intended that the MDA be enforced exclusively by the Federal Government." *Buckman* at 352.

**{¶67}** We recognize that some aspects of the instant case are distinguishable from *Buckman*. First, a presumption against preemption applies because "the history of tobacco regulation is, until recently, one of state and local action." *R.J. Reynolds*, 29 F.4th at 549; *see Austin v. Tennessee,* 179 U.S. 343, 348 (1900). So unlike the parties in *Buckman,* Elevate Smoke must overcome that presumption against preemption. *See Buckman* at 348 ("[N]o presumption against pre-emption obtains in this case.").

**{¶68}** Second, the State's CSPA claims allege that Elevate Smoke deceived consumers, not the FDA. *See Lefaivre v. KV Pharmaceutical Co.,* 636 F.3d 935, 944 (8th Cir. 2011) ("the present case is distinguishable from *Buckman* because Lefaivre's state-law claims are not fraud-on-the-FDA claims, as they 'focus on [harm] that is allegedly perpetrated against [consumers] rather than the FDA.'").

**{¶69}** Third, the TCA's preservation clause "explicitly preserves local authority to enact 'more stringent' regulations than the TCA" in some aspects of tobacco products. *R.J. Reynolds Tobacco Co.*, 29 F.4th at 548; *see Wisconsinites*, 2025 U.S. Dist. LEXIS 173845, at *15.

**{¶70}** Fourth, the *Buckman* plaintiffs were private litigants. The State emphasizes this fact while pointing out the Tenth Amendment to the United States Constitution reserves all powers not delegated to the federal government to the states.

c. The State's claims are preempted

**{¶71}** Despite the differences between this case and *Buckman*, we hold that some of the State's claims are implicitly preempted under *Buckman* and 21 U.S.C. 337(a). While state, local, and tribal governments may impose stricter tobacco standards, the federal government alone can enforce the FDCA. *See* 21 U.S.C. 337(a).

**{¶72}** In the complaint, the State alleges that any e-cigarette not authorized by the FDA is "illegal." The State claimed, in Counts 1 and 2, that Elevate Smoke committed deceptive and unconscionable sales acts "by offering for sale and selling illegal [e-cigarettes]." But whether Elevate Smoke's conduct was unconscionable or deceptive depends solely on federal law. The TCA dictates that premarket-authorization review is required for all new tobacco products. *See* 21 U.S.C. 387j(a)(2)(A). Any tobacco product that must have premarket review and does not have a marketing order is an "adulterated" tobacco product. 21 U.S.C. 387b(6)(A). And 21 U.S.C. 331(c) prohibits receiving and selling adulterated tobacco products in interstate commerce. In substance, by seeking to create civil liability for Elevate Smoke's sale of unauthorized e-cigarettes, the State seeks to enforce the TCA. These claims in Counts 1 and 2 are implicitly preempted.

**{¶73}** In Count 2, the State alleged that Elevate Smoke committed an unconscionable act by "knowingly taking advantage of the inability of consumers to reasonably protect their interests as prospective consumers do not know that the products [Elevate Smoke] offered for sale and sold were not authorized or legal to be sold in the United States" because of the products' Origin Label. And Count 4 sought to create civil liability based on misrepresentations made by Elevate Smoke to the consumer. But it is federal law—the FDCA—that prohibits any "express or implied statement or representation directed to consumers with respect to a tobacco product, in a label or labeling . . . that either conveys, or misleads or would mislead consumers into believing, that . . . the product is approved by the [FDA]." 21 U.S.C. 331(tt)(1). Counts 2 and 4 are therefore implicitly preempted.

**{¶74}** The State's remaining claims contained in Counts 1 and 3 are predicated on Elevate Smoke's failure to warn consumers that, despite the presence of the Origin Label, the e-cigarettes are not authorized for sale. But were Elevate Smoke to alter the products' labels to comply with the CSPA, this conduct would amount to a per se violation of the TCA. All labels, packaging, and shipping containers of new tobacco products must state "sale only allowed in the United States." 21 U.S.C. 387t(a)(1). While the State questions whether unauthorized tobacco products must display the Origin Label, premarket-authorization applications must include samples of packaging and all warning labels required by the TCA. 21 C.F.R. 1114(f)(1).

**{¶75}** The State's complaint does not specify, precisely, how Elevate Smoke must warn consumers that the products are unauthorized, but we read the complaint to require, at a minimum, some supplementation, if not supplantation, of the Origin Label. But the FDCA prohibits any "alteration . . . or removal of the whole or any part of the labeling of . . . [a] tobacco product" at the retail stage that would result in a

24

misbranded tobacco product. 21 U.S.C. 331(k). Under federal law, an e-cigarette is considered "misbranded" unless it bears, among other required labels, the Origin Label. *See* 21 U.S.C. 387c. Moreover, an e-cigarette is "misbranded" if a label required by the TCA, like the Origin Label, "is not prominently placed . . . with such conspicuousness." 21 U.S.C. 387c. Elevate Smoke's compliance with both the State's theory of liability under the CSPA and the TCA's label requirement is impossible.[2] The preemption doctrine does not force an actor faced with competing state and federal laws "to cease acting altogether in order to avoid liability." *Bartlett*, 570 U.S. at 488.

### d. Ohio's CSPA versus other states' tobacco laws

**{¶76}** The State relies on two recent federal district court cases addressing the preemptive effect of the TCA on Wisconsin and North Carolina laws. *See Wisconsinites*, 2025 U.S. Dist. LEXIS 173845; *see also Vapor Technology Assn. v. Wooten*, 2025 U.S. Dist. LEXIS 123020 (E.D.N.C. June 27, 2025).

**{¶77}** The Wisconsin and North Carolina statutory schemes at issue in these cases created state directories of tobacco products eligible for sale in those states. *See* Wis.Stat.Ann. 995.15(6); *see also* N.C.Gen.Stat. 143B-245.12. Under both laws, a tobacco product could be placed on those state directories if the manufacturer or retailer certified certain information about the tobacco product's premarket-

---

[2] Although Elevate Smoke did not argue this point in its brief, federal law may also preempt a state law that "'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *California v. ARC Am. Corp.*, 490 U.S. 93, 101 (1989), quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941). Here, the State's claims, based on the alleged deception created by the Origin Label, would frustrate the TCA's purpose. The TCA imposes strict labeling requirements to limit consumer confusion and to combat illicit trade of tobacco products. *See* Pub.L. No. 111-31, 123 Stat. at 1782. Again, if the State were to proceed with its CSPA claims, e-cigarette sellers like Elevate Smoke would have to choose between complying with the state law or the TCA's labeling requirements. Compliance with the CSPA would weaken Congress's attempt to prevent illicit trade and frustrate the stated purpose of the TCA.

authorization application to the state. *See* Wis.Stat.Ann. 995.15(2); *see also* N.C.Gen.Stat. 143B-245.11(a)(1)-(3). The *Wisconsinites* and *Vapor Technology* courts considered these certification requirements to be additional sales requirements under the savings clause. *See Wisconsinites* at *19; *see also Vapor Technology* at *14.

**{¶78}** As for implied preemption, those statutes were not veiled attempts at enforcing the TCA. A retailer or manufacturer could not be held liable under either Wisconsin or North Carolina law for noncompliance with the TCA's premarket-authorization scheme. *See Wisconsinites* at *19 ("[A] violation of the FDCA is not itself actionable basis for the [state] to initiate proceedings against the producers, distributors, retailers and customers of tobacco producers."). The *Wisconsinites* and *Vapor Technology* courts emphasized this point, as each state directory included authorized and unauthorized tobacco products. *See Wisconsinites* at *19 ("[A]ction may only be initiated by the sale of a product not on the Wisconsin directory, which includes TCA compliant and noncompliant products."); *see also Vapor Technology* at *14 ("Some products on the directory are compliant with the []TCA. Others are not."). Rather, retailers faced penalties in North Carolina and Wisconsin for sales of tobacco products that are not on the state directory. *See* Wis.Stat.Ann. 995.15(9); *see also* N.C.Gen.Stat. 14-313(h)(1). These statutes survived *Buckma*n and 21 U.S.C. 337(a) because enforcement turned on violations of state law, not the TCA.

**{¶79}** But here, the State's consumer-protection claims would cease to exist without the federal tobacco regulations. As discussed, many of the State's claims are, in substance, claims for TCA violations. And compliance with the remainder of the State's claims would constitute per se violations of the TCA's labeling requirements.

**{¶80}** Therefore, we hold that the State's claims are preempted by the TCA. The trial court appropriately granted summary judgment to Elevate Smoke. We overrule the State's second assignment of error.

### C. *Elevate Smoke's motion for attorney fees under App.R. 23*

**{¶81}** In its brief, Elevate Smoke requested expenses and attorney fees because, in its view, the State's appeal centered on the incredible and frivolous position that the State has the authority to enforce the FDCA under 21 U.S.C. 337(a).

**{¶82}** We may require parties to pay reasonable attorney fees and costs if we find that the appeal is frivolous. *See* App.R. 23. An appeal is frivolous under App.R. 23 when it presents no "'reasonable question for review.'" *Stewart v. Stewart*, 2025-Ohio-1635, ¶ 59 (1st Dist.), quoting *Burdge v. Supervalu Holdings, Inc.*, 2007-Ohio-1318, ¶ 22 (1st Dist.).

**{¶83}** We hold that the State's appeal presents reasonable questions for review and we deny Elevate Smoke's request for costs and attorney fees.

### III.  Conclusion

**{¶84}** We overrule the State's assignments of error and affirm the trial court's judgment. Further, we deny Elevate Smoke's motion for attorney fees and costs.

Judgment affirmed.

**KINSLEY, P.J.,** and **NESTOR, J.,** concur.

27